**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Allan PARMELEE, Ewa Brozek–Lukaszuk, Alojzy Sandrzyk, Tadeusz Sobiecki, and Lester Lukaszuk, Defendants–Appellants.**

**Nos. 92–3479, 92–3487, 92–3500, 92–3559 and 93–1265.**

United States Court of Appeals, Seventh Circuit.

· Argued April 14, 1994.

Decided Dec. 9, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 27, 1995 in Nos. 92–3479, 92–3500, 92–3559, 93–1265.

Madeleine S. Murphy, Asst. State's Atty., Crim. Div. (argued), Chicago, IL, Barry Rand Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for U.S.

Kathleen T. Zellner, Michael Hemstreet (argued), Zellner & Associates, Naperville, IL, for Allan Parmelee.

Kent R. Carlson (argued), Jerry B. Kurz, Kathryn Hall, Hall & Kurz, Chicago, IL, for Ewa Brozek–Lukaszuk.

Joseph J. Cavanaugh, Soso & Cavanaugh, Chicago, IL (argued), for Alojzy Sandrzyk.

Michael P. Mullen, Mullen, Raleigh & Cahill, Chicago, IL (argued), for Tadeusz Sobiecki.

Before POSNER, Chief Judge, and COFFEY, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

This case arose out of an investigation initiated by the Royal Canadian Mounted Police into suspicious activity at Grimsby Airpark, a small, rural airstrip located approximately one hour southwest of Toronto, Ontario, just north of the Canada–United States international border. Several individuals reported seeing a small Piper Cherokee plane landing on numerous occasions when the airpark was closed, taking on passengers, and departing after being on the ground a short time. Once it was determined that the

plane was based at the DuPage County Airport in West Chicago, Illinois, agents of the United States Immigration and Naturalization Service arranged for dual surveillance of the plane's activities at Grimsby Airpark and DuPage Airport. Largely as a result of this surveillance, the investigation revealed eight instances between February 12, and April 21, 1991, in which illegal Polish aliens were smuggled into this country. On each occasion, the aliens, who were carrying luggage, were driven by car in prearranged rides to Grimsby Airpark. There, the aliens were met by pilot Allan Parmelee, who flew them to DuPage Airport where they arrived late at night. From the airport, Parmelee drove the aliens to a prearranged rendezvous point in Chicago, usually a gas station, where Parmelee delivered the aliens to Tadeusz Sobiecki. After taking delivery of the aliens, Sobiecki drove them by car either to their final destinations in Chicago or to other locations where he transferred the aliens to Ewa Brozek–Lukaszuk, her husband Lester Lukaszuk, and Alojzy Sandrzyk, among others, for further transport.

A grand jury returned a seventeen-count superseding indictment against Parmelee, Sobiecki, Brozek–Lukaszuk, Lukaszuk, and Sandrzyk. Count One charged all five defendants with conspiring to transport illegal aliens within the United States in violation of 18 U.S.C. § 371 and 8 U.S.C. § 1324(a)(1)(B).[1] Counts Two, Four, Six, Eight, Ten, Twelve, Fourteen, and Sixteen charged Parmelee with knowingly bringing aliens into the United States at a place other than a designated port of entry in violation of

8 U.S.C. § 1324(a)(1)(A).[2] The remaining counts charged the various defendants with substantive violations of 8 U.S.C. § 1324(a)(1)(B).

The defendants pleaded not guilty, and the case went to trial before a jury. In the midst of trial, Parmelee withdrew his plea of not guilty and entered a plea of guilty to all seventeen counts of the indictment. The trial continued against the remaining defendants whom the jury found guilty as charged in the indictment. The district court sentenced the defendants to the following terms of imprisonment: Parmelee, twenty-one months; Sobiecki, thirty-six months; Brozek–Lukaszuk, six months; and Sandrzyk, twelve months. Lukaszuk was sentenced to three years of probation, with the special condition that he serve the first sixty days in custody.

On appeal, the defendants raise a number of issues but only two require consideration: (1) the sufficiency of the instructions given to the jury for the section 1324(a)(1)(B) offense, and (2) the three-level enhancement of Parmelee's base sentencing level under U.S.S.G. § 3B1.1(b) for his managerial or supervisory role in the offense. For the reasons set forth below, we affirm the convictions and sentences of Sobiecki, Brozek–Lukaszuk, Lukaszuk, and Sandrzyk, but remand the case to the district court for resentencing of Parmelee.

### I.

█ Sobiecki, Brozek–Lukaszuk, Lukaszuk, and Sandrzyk[3] contend that their

---

1. Section 371 provides that, "[i]f two or more persons conspire to commit any offense against the United States or any agency thereof in any manner or for any purpose and one or more of such persons do any act to effect the object of the conspiracy, each shall be guilty of an offense against the United States." 18 U.S.C. § 371.

   Section 1324(a)(1)(B) makes it a felony for [a]ny person who knowingly or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law.
   8 U.S.C. § 1324(a)(1)(B).

2. Section 1324(a)(1)(A) makes it a felony for

   [a]ny person who knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any further official action which may be taken with respect to such alien.
   8 U.S.C. § 1324(a)(1)(A).

3. Sandrzyk raised this issue by way of adoption pursuant to Fed.R.App.P. 28(i). Parmelee, by pleading guilty, "waive[d] all nonjurisdictional

convictions for transporting illegal aliens in violation of section 1324(a)(1)(B) should be reversed because the district court erroneously failed to instruct the jury on an essential element of the offense—the defendants' willfulness in furthering the aliens' continued illegal presence in the United States. The district court instructed the jury as follows:

Counts 3, 5, 7, 9, 11, 13, 15, and 17 of the indictment charge one or more of the defendants with unlawfully transporting aliens within the United States in violation of Title 8, United States Code, Section 1324(a)(1)(B). That statute provides in relevant part:

'Any person who knowing or in reckless disregard of the fact that an alien has come to, entered or remains in the United States in violation of law, transports or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise in furtherance of such violation of law shall be guilty of an offense against the United States.'

You should refer to the indictment to determine which defendant is charged in each count.

In order to sustain a charge of unlawful transportation of an alien within the United States the government must prove each of the following propositions beyond a reasonable doubt:

First, that the alien had entered or remained in the United States in violation of law;

Second, that the defendant knew or recklessly disregarded the fact that the alien had entered or remained in the United States in violation of law; and

Third, that the defendant transported the alien in furtherance of the alien's unlawful entry to or presence in the United States.

\*  \*  \*  \*  \*  \*

In order for transportation to be in furtherance of an alien's unlawful entry or presence, there must be a direct or substantial relationship between the defendant's act of transportation and the alien's unlawful entry to or presence in the United States. In other words, the act of transportation must not be merely indicental [sic] to a furtherance of the alien's violation of the law.

An act of transportation is in furtherance of the alien's unlawful entry of [sic] presence if such transportation brings the alien to his or her destination or place of refuge, or helps the alien remain in the country unlawfully, undetected by those responsible for enforcing the immigration laws.

A surreptitious or furtive transportation of an alien which inhibits the enforcement of immigration laws may be in furtherance of the alien's unlawful entry of [sic] presence.

(Tr. 2954–56). The defendants argue that these instructions allowed the jury to find them guilty simply for transporting illegal aliens even if they did not know they were furthering the aliens' violation of the law.

■ We have no question that section 1324(a)(1)(B) implicitly requires the government to prove beyond a reasonable doubt not only that the defendant knew the alien he transported had entered this country in violation of immigration law, but also that the defendant knowingly transported the alien to further that violation, that is, acted willfully. *See, e.g., United States v. Chavez–Palacios,* 30 F.3d 1290, 1294 (10th Cir.1994); *United States v. Diaz,* 936 F.2d 786, 788 (5th Cir. 1991); *United States v. Medina–Garcia,* 918 F.2d 4, 7 (1st Cir.1990); *United States v. Hernandez,* 913 F.2d 568, 569 (8th Cir.1990) (per curiam); *United States v. Morales–Rosales,* 838 F.2d 1359, 1360 (5th Cir.1988); *United States v. Merkt,* 764 F.2d 266, 270 (5th Cir.1985) (per curiam); *United States v. Moreno,* 561 F.2d 1321, 1322 (9th Cir.1977). Without a *mens rea* requirement, section 1324(a)(1)(B) could penalize purely innocent conduct. *Staples v. United States,* —— U.S. ——, ——, 114 S.Ct. 1793, 1799, 128 L.Ed.2d 608 (1994); *Liparota v. United States,* 471 U.S. 419, 426, 105 S.Ct. 2084, 2088, 85

defects in the proceeding." *United States v. Markling,* 7 F.3d 1309, 1312 (7th Cir.1994); *see*

*Tollett v. Henderson,* 411 U.S. 258, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973).

L.Ed.2d 434 (1985). For example, it could conceivably criminalize the actions of a cab driver who transports in a routine commercial transaction an individual who announces his illegal alien status during the course of the ride. We do not read section 1324(a)(1)(B) as enacting such sweeping liability. *See United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (absurd results are to be avoided); *United States v. Wilson,* —— U.S. ——, ——, 112 S.Ct. 1351, 1354, 117 L.Ed.2d 593 (1992) (same); *Matter of Udell,* 18 F.3d 403, 410–12 (7th Cir.1994) (Flaum, J., concurring) (same). Rather, we hold that a defendant's guilty knowledge that his transportation activity furthers an alien's illegal presence in the United States is an essential element of the crime stated in section 1324(a)(1)(B). In so holding, we decline to adopt a special test for determining guilty knowledge. *See United States v. 1982 Ford Pick–Up,* 873 F.2d 947, 950–51 (6th Cir.1989) (comparing "direct or substantial relationship" and "intent-based" approaches). As in other criminal prosecutions that require *mens rea,* the government may prove the defendant's knowledge by reference to the facts and the circumstances surrounding the case. *Liparota,* 471 U.S. at 434, 105 S.Ct. at 2093. Relevant considerations bearing on this issue include whether the defendant received compensation for his transportation activity, whether the defendant took precautionary efforts to conceal the illegal aliens, and whether the illegal aliens were the defendant's friends or co-workers or merely human cargo. *1982 Ford Pick–Up,* 873 F.2d at 951; *United States v. Perez–Gomez,* 638 F.2d 215, 218–19 (10th Cir.1981); *United States v. Salinas–Calderon,* 585 F.Supp. 599, 602 (D.Kan.1984).

We also believe that the instructions as a whole did not clearly place this element before the jury. *See United States v. Goines,* 988 F.2d 750, 772 (7th Cir.) (in reviewing instructions to the jury, we consider the charge as a whole), *cert. denied,* —— U.S. ——, 114 S.Ct. 241, 126 L.Ed.2d 195 (1993). While the jury was instructed concerning the general definition of "knowingly" taken from our pattern instructions,[4] Federal Criminal Jury Instructions of the Seventh Circuit § 6.04 (1980), the jury was not specifically informed that to be guilty the defendants had to know not only that the Polish aliens had entered this country illegally, but also that they were furthering the aliens' illegal entry by transporting them. *See Liparota,* 471 U.S. at 424–25 n. 7, 105 S.Ct. at 2088 n. 7; *United States v. Kerley,* 838 F.2d 932, 937 (7th Cir.1988). A proper jury instruction under section 1324(a)(1)(B) could have been made either by appending the requisite mental state to the third element of the offense or by adding it as a fourth element and by deleting the remainder of the charge, which was ambiguous regarding the statute's state of mind requirement.[5] *See Liparota,* 471 U.S. at 433 n. 16, 105 S.Ct. 2093 n. 16.

---

4. The instructions stated:
   When the word 'knowingly' is used in these instructions, it means that the defendant realized what he or she was doing and was aware of the nature of his or her conduct and did not act through ignorance, mistake or accident. Knowledge may be proved by a defendant's conduct and by all the facts and circumstances of the case.
   (Tr. 2656–57).

5. In the first instance, the instruction would read:
   In order to sustain a charge of unlawful transportation of an alien within the United States the government must prove each of the following propositions beyond a reasonable doubt: First, that the alien had entered or remained in the United States in violation of law; Second, that the defendant knew or recklessly disregarded the fact that the alien had entered or remained in the United States in violation of law; and Third, that the defendant *knowingly* transported the alien in furtherance of the alien's unlawful entry to or presence in the United States. (emphasis added).
   In the second instance, the instruction would read:
   In order to sustain a charge of unlawful transportation of an alien within the United States the government must prove each of the following propositions beyond a reasonable doubt: First, that the alien had entered or remained in the United States in violation of law; Second, that the defendant knew or recklessly disregarded the fact that the alien had entered or remained in the United States in violation of law; *Third, that the defendant transported the alien within the United States; and Fourth, that the defendant acted willfully in furtherance of the alien's violation of the law.* (emphasis added).

Hence, we are left with the question whether this error, which bears on the Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict, *Sullivan v. Louisiana,* —— U.S. ——, ——–——, 113 S.Ct. 2078, 2079–80, 124 L.Ed.2d 182 (1993), automatically entitles the four defendants to a new trial, or whether it is instead subject to the harmless-error analysis originated in *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.").[6] While the Supreme Court has yet to decide the question whether instructional error of this sort can ever be harmless,[7] we believe that in light of *Sullivan,* its most recent pronouncement on the circumstances in which *per se* error will be found, the Court would resolve this question in the affirmative. Thus, our application of the reasoning in *Sullivan* to the facts of the present case leads us to conclude that the district court's failure to clearly instruct the jury on section 1324(a)(1)(B)'s guilty knowledge requirement is amenable to harmless-

error review. In our opinion, there exists "beyond a reasonable doubt" jury findings from which we can say that the instructional error did not contribute to the jury's verdict of guilty.

In *Sullivan,* the defendant argued on direct appeal from his conviction for first-degree murder that the reasonable doubt instruction given at his trial was unconstitutional. The State of Louisiana conceded that the jury instruction was erroneous, but claimed that it was harmless. Justice Scalia, writing for a unanimous Supreme Court, disagreed and held that a constitutionally deficient reasonable-doubt instruction can never be harmless error.[8] The Court reasoned that the harmless-error inquiry in *Chapman*

is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be— would violate the jury-trial guarantee.

---

**6.** Though the government failed to argue harmlessness, we are authorized to overlook it, and do so in this case, given the certainty of harmlessness. *See United States v. Giovannetti,* 928 F.2d 225, 226 (7th Cir.1991) (per curiam). Compare *United States v. Kerley,* 838 F.2d 932 (7th Cir. 1988), in which we declined to relieve the government of its failure to invoke harmless error. *Id.* at 942.

**7.** In *State v. Teel,* 793 S.W.2d 236 (Tenn.1990), a felony murder case, the Supreme Court of Tennessee held that the trial court's failure to instruct the jury on the definition of the underlying felony of rape was harmless error. Justice White, dissenting from the U.S. Supreme Court's denial of certiorari, stated:

As the Tennessee Supreme Court noted, a conflict of authority exists concerning the availability of harmless-error analysis in this situation. Several Courts of Appeal have held that error resulting from a failure to give proper instructions on the essential elements of an offense cannot be harmless. *Hoover v. Garfield Heights Municipal Court,* 802 F.2d 168, 175–79 (CA6 1986); *United States v. Howard,* 506 F.2d 1131, 1133–34 (CA2 1974); *United States v. Gaither,* 440 F.2d 262, 264 (CADC 1971). Others have held that harmless-error analysis can apply. *Redding v. Benson,* 739 F.2d 1360 (CA8 1984), *cert. denied,* 469 U.S. 1222, 105 S.Ct.

1210, 84 L.Ed.2d 352 (1985); *Bell v. Watkins,* 692 F.2d 999, 1004 (CA5 1982). The depth of this conflict underscores the importance of the question. Both considerations counsel for a grant of certiorari.

*Teel v. Tennessee,* 498 U.S. 1007, 1008, 111 S.Ct. 571, ——, 112 L.Ed.2d 577 (1990).

**8.** Justice Rehnquist, concurring in the judgment, emphasized that the instructional error at issue was among the select few that were not subject to harmless-error review. *See Sullivan,* —— U.S. at ——, 113 S.Ct. at 2083 (Rehnquist, J., concurring) ("[I]t is the rare case in which a constitutional violation will not be subject to harmless-error analysis."); *compare Arizona v. Fulminante,* 499 U.S. 279, 289, 111 S.Ct. 1246, 1254, 113 L.Ed.2d 302 (1991) (citing use of a coerced confession against a defendant, deprivation of counsel, and trial before a biased judge as examples of structural errors), *with, e.g., Carella v. California,* 491 U.S. 263, 109 S.Ct. 2419, 105 L.Ed.2d 218 (1989) (per curiam) (instruction imposing mandatory presumptions was subject to harmless error analysis); *Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987) (instruction misstating an element of the offense in obscenity prosecution); *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (instruction containing erroneous burden-shifting presumption).

—— U.S. at ——–——, 113 S.Ct. at 2081–82 (emphasis in original) (citations omitted). The Court determined that in the context of a defective reasonable-doubt instruction, the *Chapman* standard did not apply.[9] *Id.* ——, 113 S.Ct. at 2082. The Court stated:

> There being no jury verdict of guilty-beyond-a-reasonable-doubt, the question whether the *same* verdict of guilty-beyond-a-reasonable-doubt would have been rendered absent the constitutional error is utterly meaningless. There is no *object*, so to speak, upon which harmless-error scrutiny can operate. The most an appellate court can conclude is that a jury *would surely have found* petitioner guilty beyond a reasonable doubt—not that the jury's actual finding of guilty beyond a reasonable doubt *would surely not have been different* absent the constitutional error. That is not enough. The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action, or else directed verdicts for the State would be sustainable on appeal; it requires an actual finding of guilty.

*Id.* (emphasis in original) (citations omitted). The Court distinguished an instruction that erects a presumption regarding an element of the offense from one that misdescribes the burden of proof because in the latter instance the error "vitiates *all* the jury's findings" and leads the appellate court to simply speculate as to what a rational jury would have done. *Id.* In the case of a mandatory presumption, the instructional error would be found harmless "when the [predicate] facts 'are so closely related to the ultimate fact to be presumed that no rational jury could find those facts without also finding that ultimate fact, making those findings is functionally equivalent to finding the element required to be presumed.'" *Id.* (quoting *Carella v. California,* 491 U.S. 263, 271, 109 S.Ct. 2419, 2423–24, 105 L.Ed.2d 218 (1989) (per curiam) (Scalia, J., concurring)).

Under the above-quoted harmless-error analysis formulated by Justice Scalia in *Carella* and followed in *Sullivan,* the instructional error here is harmless if, given the facts of this case, no rational jury could have found the defendants guilty of violating section 1324(a)(1)(B) without also making the proper factual finding as to the missing element of willfulness. *See id.; Carella,* 491 U.S. at 271, (Scalia, J., concurring); *see also Green v. Peters,* 36 F.3d 602, 608–11 (7th Cir.1994) (Ripple, J., concurring) (advancing Justice Scalia's harmless-error test on collateral review of instructional error under *Falconer v. Lane,* 905 F.2d 1129 (7th Cir.1990)).

In this case, the jury was not asked to find that the defendants acted knowingly in transporting the illegal aliens. Rather, the instruction referred only to the defendants' knowledge of the aliens' violation of immigration law. In theory, under such an instruction, a jury could convict our aforementioned hypothetical cab driver for transporting a known illegal alien without also finding that the cab driver did so knowingly in furtherance of the alien's violation of the law. However, under the factual circumstances of this case, we believe that a rational jury, which found that the defendants knew the aliens were illegal, also would have necessarily found that the defendants knew their activity furthered the aliens' violation of the law. We base this determination on the unrebutted evidence that the defendants furtively transported the aliens late at night; drove evasively to elude police surveillance, at times at high rates of speed; and received compensation by the carload for the delivery of luggage-laden and foreign-speaking aliens who were strangers to the defendants. In view of this significant amount of *mens rea* evidence, we conclude that no rational jury could have found that the defendants did not act knowingly in furthering the transport of the illegal aliens. We accordingly hold that the error was harmless beyond a reasonable doubt. *Chapman,* 386 U.S. at 24, 87 S.Ct. at 828; *Sullivan,* —— U.S. at ——–——, 113 S.Ct. at 2081–82; *see also, e.g., United States v. Whitmore,* 24 F.3d 32, 36 (9th Cir.1994) (instruction that omitted knowledge element of the crime of using a communication facility to

9. In the alternative, the Court held that the deficient reasonable-doubt instruction amounted to a "structural defect in the constitution of the trial mechanism" and is never harmless. *Sullivan,* —— U.S. at ——–——, 113 S.Ct. at 2082–83; *see Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

**394**

engage in drug trafficking); *Ianniello v. United States,* 10 F.3d 59, 65 (2d Cir.1993) (instruction that failed to inform the jury in a RICO action that predicate acts must be related).

Our prior decisions on instructional error involving a missing element of an offense, *United States v. Dunkel,* 927 F.2d 955 (7th Cir.1991) (per curiam), and *United States v. Kerley,* 838 F.2d 932 (7th Cir.1988), are not inconsistent with this approach. *Dunkel,* a per curiam opinion, held that withdrawal of the defense of good faith misinterpretation of the law in a criminal tax prosecution was not harmless error. 928 F.2d at 956. In so holding, we relied on Justice Scalia's concurrence in *Carella v. California,* which became the genesis for his harmless-error test in *Sullivan. See id.* By implicitly adopting Justice Scalia's test, this court merely reached a contrary conclusion concerning the applicability of *Chapman* based on the particular facts before it.

In *Kerley,* an opinion that predated both *Carella* and *Sullivan,* the defendant was charged with refusing to register for the draft in violation of 50 U.S.C.App. § 462(a). The district court's instruction to the jury omitted the element of the offense that the defendant know he had a duty to register. This court reviewed the instruction under the plain-error rule and concluded that "[n]o reasonable jury could have concluded that [the defendant] did not know he had a legal duty to register." 838 F.2d at 937. Although we noted that "among the errors to which the harmless-error rule does not apply is an error that has the practical effect of withdrawing the issue of guilt from the jury," the situation of the defendant in *Kerley* was distinguished on the ground that it involved "merely [a] fail[ure] to instruct clearly on an element of the crime." [10] *Id.* at 938.

For support, we cited the Supreme Court's decision in *Pope v. Illinois,* 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987), which rejected the proposition that "a conviction can never stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of

proof." *Id.* We also noted this circuit's "narrow" interpretation of the category of fatal errors, *id.,* as well as its "reluctance to reverse a conviction because of defective instructions even if the defects concern the elements of the crime, unless the defects might have made a difference to a rational jury." *Id.* at 939. After describing the results in other circuits as "mixed," we concluded:

> We prefer the statement by the Second Circuit that, 'in *general,* failure to instruct the jury on an essential element of the offense constitutes plain error.' *United States v. Golomb,* 811 F.2d 787, 793 (2d Cir.1987) (emphasis added); *see also Government of Virgin Islands v. Brown,* 685 F.2d 834, 839 (3d Cir.1982); *cf. United States v. Polowichak,* 783 F.2d 410, 417 (4th Cir.1986). That formulation allows for the exceptional case, and this is one. The district judge did not fail to instruct the jury on knowledge. He failed to give an instruction that distinguished between knowledge of fact and knowledge of legal duty; and although this was a serious failure, it was not so egregious as to justify a retrial in a case where the issue of guilty knowledge was not contestable and was barely if at all contested. We are worlds away from the paradigmatic case of plain error per se; the case where the judge directs a verdict of guilty.

*Id.*

On rehearing, however, the defendant successfully demonstrated that he had properly preserved his objection to the erroneous jury instruction pursuant to Fed.R.Crim.P. 30. *Id.* at 942. Accordingly, we issued a supplemental opinion, holding that, "[t]he ground was valid, and although the error was not plain, the government does not argue that it was harmless; it was therefore a reversible error, so Kerley is entitled to a new trial." *Id.* While, at first glance, this specific language may appear to suggest that an instructional error on the elements of an offense is never harmless, the opinion itself does not purport to adopt any *per se* approach. In any event, as discussed above, the more re-

[10]. We acknowledged, however, that the difference between this instruction and one that omits an element of the offense was not determinative. *Id.* at 938.

cent Supreme Court jurisprudence would appear to disfavor the creation of such a rule. To this observation, we wish to underscore that the doctrine of harmless-error "has become an integral component of our criminal justice system." *Sullivan,* —— U.S. at ——, 113 S.Ct. at 2084 (Rehnquist, J., concurring). It "recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error." *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986).

## II.

■ The second issue concerns the propriety of the district court's finding that pilot Parmelee acted as a either a manager or supervisor in the smuggling ring, resulting in a three-level increase in his base sentencing level under U.S.S.G. § 3B1.1(b).[11] The three-level increase for being a manager or supervisor in an offense

> is appropriate for those defendants whose "relative responsibility" for the offense is found to have been greater than that of its other participants. In determining relative responsibility, a significant factor to be considered is whether the defendant exercised authority or control over others in the criminal operation. The fact, however, that the defendant did not exercise such control, in the sense of having power to tell the others what to do, does not necessarily disqualify the defendant for a Section 3B1.1 increase. Rather, in some cases it may be enough that the defendant "orchestrated" or simply "coordinated" the activities of others.

*United States v. Vargas,* 16 F.3d 155, 160 (7th Cir.1994).

Based on our review of the record, we conclude that there was insufficient evidence to support the finding that Parmelee played a supervisory or managerial role. As the pilot, Parmelee certainly was an important player in the smuggling ring, but we cannot find evidence that shows he controlled or coordinated any of his co-defendants' activities. The government points to Parmelee's receipt of money from Sobiecki for his services, his purchase of a beeper to inform Sobiecki of flight departures and arrivals, and his upkeep and rental of the plane. These activities, however, may be merely inherent in Parmelee's role as pilot and do not necessarily indicate that Parmelee managed or supervised others. While it could be said that Parmelee managed the illegal aliens he flew across the border, such conduct does not warrant a section 3B1.1(b) enhancement. *See United States v. Mejia–Orosco,* 867 F.2d 216, 220 (5th Cir.) ("[F]or the purpose of § 3B1.1, the aliens smuggled, transported, or harbored are not considered participants unless they actively assisted in the smuggling, transporting or harboring of others.") (citing Commentary to U.S.S.G. § 2L1.1, which concerns the smuggling, transporting, or harboring of illegal aliens), *cert. denied,* 492 U.S. 924, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989). Given the record before us, the district court erred in finding that Parmelee was a manager or supervisor of the illegal alien smuggling ring. *See Vargas,* 16 F.3d at 160.

## III.

In conclusion, we affirm the convictions and sentences of Sobiecki, Brozek–Lukaszuk, Lukaszuk, and Sandrzyk. The case is remanded for resentencing of Parmelee.

AFFIRMED IN PART AND REMANDED IN PART.

COFFEY, Circuit Judge, concurring in part and dissenting in part.

I join with the majority in upholding the convictions and sentences of defendants Tadeusz Sobiecki, Ewa Brozek–Lukaszuk, Lester Lukaszuk, and Alojzy Sandrzyk, but dissent from the majority's reversal of the district court's three-level enhancement of defendant Allan Parmelee's base offense level

---

11. Section 3B1.1(b) provides for a three-level upward departure "[i]f the defendant was a manager or supervisor ... and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b).

under U.S.S.G. § 3B1.1(b) for his managerial/supervisory role in the offense.

In the midst of trial, Parmelee entered a plea of guilty to the seventeen count indictment charging him with unlawfully transporting thirty-three illegal Polish aliens to the United States by air from Canada between February 12, 1991 and April 21, 1991, unlawfully transporting them within the United States, and conspiracy. Parmelee, the pilot of a small Piper Cherokee plane, was at the center of a large-scale, long-term,[1] sophisticated smuggling operation whose purpose was to bring Polish aliens illegally into the United States from Canada and convey them to their destination in this country.

Parmelee had the exclusive power and discretion to determine every aspect of his passengers' journey from Canada to their destination in the United States. Parmelee was responsible for securing and renting a plane and assuring that it was in proper working order for the illicit alien flight conspiracy. Parmelee went so far as to purchase a beeper in order that he and Sobiecki might keep in constant contact concerning flight departures and arrivals. As the pilot of the aircraft,[2] Parmelee chose the airfield from which to depart, determined flight departure and arrival times, selected the flight route least likely to attract the attention of immigration officials, and frequently deviated from acceptable altitudes to evade radar detection. Parmelee was vested with the ultimate authority to determine who could board the plane and how much baggage each passenger could bring. It was within Parmelee's power to alter the flight route at any time, or even abort a landing if he suspected trouble from or detection by immigration officials. From the time the Piper Cherokee left the runway at Grimsby Airpark to the moment the plane came to rest on the tarmac at DuPage County Airport, the success of the Polish passengers' journey rested in Parmelee's hands. The aliens remained under Parmelee's supervision and control until he finally delivered them into the hands of Sobiecki.

Despite substantial evidence that Parmelee orchestrated the most critical leg of the Polish aliens' passage to America, the majority concludes that:

> [a]s the pilot, Parmelee certainly was an important player in the smuggling ring, but we cannot find evidence that shows he controlled or coordinated any of his codefendants' activities. The government points to Parmelee's receipt of money from Sobiecki for his services, his purchase of a beeper to inform Sobiecki of flight departures and arrivals, and his upkeep and rental of the plane. These activities, however, may be merely inherent in Parmelee's role as a pilot and do not necessarily indicate that Parmelee managed or supervised others. While it could be said that Parmelee managed the illegal aliens he flew across the border, such conduct does not warrant a section 3B1.1(b) enhancement.

I am forced to disagree with and dissent from the majority's conclusion that Parmelee was not a manager/supervisor within the meaning of U.S.S.G. § 3B1.1(b).

## I.  FACTUAL BACKGROUND

The majority holds that Parmelee's actions in furtherance of the smuggling ring were "merely inherent in Parmelee's role as a pilot" and therefore cannot support the three-level sentence enhancement, even though the trial testimony, indictment, presentence report, and sentencing hearing tes-

---

**1.** Although the indictment sets forth only those incidents that occurred between February and April 1991, Parmelee admitted that he had been coordinating the unlawful transportation of Polish aliens from Canada with Sobiecki since the summer of 1988. He admitted that his involvement in the criminal operation continued through the time of the indictment and that he was smuggling illegal aliens from Canada at least once every three months and as frequently as several times per week. Phone records introduced at trial demonstrated that Parmelee made calls to Sobiecki from Grimsby Airpark in Ontario as early as September 1990. Moreover, the Royal Canadian Mounted Police began receiving reports of suspicious activity at Grimsby Airpark involving Parmelee's aircraft as early as November 1990.

**2.** "The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft." 14 C.F.R. § 91.3 (1994).

timony convincingly portray Parmelee as a key player.

At trial, the government presented evidence demonstrating that Parmelee usually carried a group of three to five illegal Polish aliens on each flight. The aliens were driven by an unknown individual to Grimsby Airpark, a small rural airstrip just north of the Canada–United States international border.[3] Late in the evening when the airstrip was closed for business and virtually deserted, Parmelee would arrive at Grimsby with the plane, load the passengers and baggage, and depart shortly thereafter hoping to avoid detection or apprehension by the authorities. According to the record, Parmelee would then fly to DuPage County Airport in Illinois, sometimes at dangerously low altitudes to avoid radar detection. After landing at DuPage, Parmelee would drive the aliens to a meeting place he had pre-arranged with Sobiecki. Because Parmelee played such an important role in the alien smuggling conspiracy, Sobiecki rewarded Parmelee handsomely for the transportation of each illegal alien. Parmelee received $700 to $1,000 for each illegal person who boarded his plane— nearly one-third of the average $3,000 each alien paid for passage to the United States. Parmelee's meetings with Sobiecki generally occurred in the middle of the night and lasted but a few minutes, again to avoid the watchful eyes of immigration officials.[4]

Pursuant to a plea agreement with the government, Parmelee agreed to plead guilty to all seventeen counts of the indictment and provide details of the criminal operation to the court. The government, in turn, agreed to recommend a two-point offense level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1. In exchange for Parmelee's cooperation, the government also agreed that it would not seek an upward departure from the applicable sentencing guideline range.

At the plea hearing, Judge Zagel ensured that Parmelee understood fully the nature of the charges against him and the rights he would waive by pleading guilty. Parmelee testified that he was lawfully employed as a computer systems analyst and had two years of college education, and confirmed that he had discussed the terms of the plea agreement with his attorney. The following exchange took place at the sentencing hearing:

THE COURT: You are essentially charged in Count 1 with entering into a conspiracy with a variety of other people to knowingly transport persons, illegal aliens into the United States. Do you understand that charge against you?

DEFENDANT PARMELEE: Yes, I do, Your Honor.

THE COURT: And in addition to that general conspiracy charge, there are some specific charges against you that on certain specific dates you did in fact bring a specified number of illegal aliens into the country knowing that they were illegal aliens. Do you understand that charge?

DEFENDANT PARMELEE: Yes, I do.

. . . .

3. According to the Presentence Report ("PSR"), Parmelee's initial flights departed from an airport in Welland, Ontario, a port of entry. Parmelee later decided that Welland was not a safe location from which to depart with illegal aliens because immigration officials were more likely to be present at a port of entry. Parmelee, thus vested with the authority to choose another airport, changed the point of embarkation to Grimsby Airpark, a small airstrip which was not a port of entry, and arrived and departed from Grimsby when the airstrip was closed.

4. Eight smuggling trips formed the basis of the indictment. On February 12, 1991, Parmelee flew three illegal Polish aliens from Grimsby to DuPage, and delivered them by car to Sobiecki in Chicago. On March 13, 1991, Parmelee flew to Grimsby with a passenger who previously had been convicted of smuggling illegal Polish aliens from Canada into the United States. Parmelee returned to DuPage with his original passenger and four additional Polish aliens. On March 19, 1991, Parmelee flew four illegal aliens from Grimsby to DuPage, and once again drove the four to a rendezvous with Sobiecki. On March 25, 1991, Parmelee transported three more aliens from Grimsby to DuPage. On March 26, 1991, Parmelee flew five Polish aliens from Grimsby to DuPage, and drove them to meet Sobiecki in Chicago. Once on April 10, 1991 and again on April 15, 1991, Parmelee flew to Grimsby, returning to DuPage with five illegal aliens on each flight. Finally, on April 21, 1991, Parmelee flew three aliens from Grimsby to DuPage and delivered them to Sobiecki. Later that evening, Parmelee and Sobiecki were arrested at their respective residences.

THE COURT: Did you read a copy of the indictment in this case?

DEFENDANT PARMELEE: Yes, I have.

THE COURT: You discussed it with your attorney?

DEFENDANT PARMELEE: Yes.

Judge Zagel then explained the maximum possible penalty for the offenses charged in the indictment:

THE COURT: The maximum possible punishment under the offenses to which you are pleading guilty is a term of 85 years, that is, five years on each count; a maximum fine of $4,250,000; a time of supervised release of three to five years in duration; and there is at least a theoretical possibility I may order restitution if there are sums to be given in restitution in this case. Do you understand that's the maximum possible punishment you face?

DEFENDANT PARMELEE: I understand.

Judge Zagel explained the sentencing procedures under the Guidelines, and made clear that the court was not bound by the plea agreement and could impose any sentence authorized by law. From this record, I am convinced that Parmelee knowingly and voluntarily pleaded guilty to all charges in the indictment and accordingly waived the right to challenge any of the facts stated therein. *See McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969) ("a guilty plea is an admission of all the elements of a formal criminal charge"); *United States v. Tolson,* 988 F.2d 1494, 1501 (7th Cir.1993) ("a defendant who pleads guilty to an indictment voluntarily and with the assistance of counsel ... may not challenge the facts of the indictment on appeal"). Parmelee, "[h]aving pleaded guilty to membership in the conspiracy as charged in the indictment knowingly and intelligently, and with the advice of counsel, ... has relinquished the right to challenge the conspira-

cy." *United States v. Savage,* 891 F.2d 145, 150 (7th Cir.1989).

After the plea hearing, a probation officer conducted an investigation, interviewed Parmelee, and submitted a Presentence Report to Judge Zagel. The probation officer determined Parmelee's criminal history category to be III,[5] and his base offense level to be nine. The PSR added three points to the base offense level for Parmelee's managerial/supervisory role in the offense (U.S.S.G. § 3B1.1(b)), two points for Parmelee's reckless endangerment of others while transporting the illegal aliens, *i.e.,* his flying at dangerously low altitudes and driving at speeds in excess of 95 miles per hour (U.S.S.G. § 3C1.2), and subtracted two points for acceptance of responsibility (U.S.S.G. § 3E1.1). The resulting offense level was twelve, implicating a sentencing range of from fifteen to twenty-one months' imprisonment.

As justification for the three point increase for Parmelee's managerial/supervisory role in the offense, the probation officer noted in the PSR that:

Based on information provided to this writer, the defendant had a managerial or supervisory type role in the overall smuggling operation. He had some decision making authority and a high level of participation in planning and organizing, in that he was responsible for renting, maintaining and piloting the airplane used to smuggle in the aliens; *he decided when and where to land the craft; and he coordinated with Codefendant Sobiecki the times and dates of the smuggling trips.* Pursuant to guideline 3B1.1(b), a three-level increase is warranted.

. . . .

The defendant was involved in a large-scale, well-coordinated and sophisticated illegal alien smuggling operation. Although the indictment charges that the conspiracy took place between February and April 1991, *by his own admission the defendant was smuggling in illegal Polish aliens*

---

5. Parmelee has had significant experience with the criminal justice system. Between 1975 and 1990, he was arrested seventeen times, nine of which resulted in convictions. The PSR notes that the vast majority of his prior arrests were for

passing worthless checks, but his convictions also resulted from offenses ranging from larceny to assault. Parmelee was serving a two-year term of probation when he was arrested for his participation in the alien smuggling scheme.

*from Canada as early as the summer of 1988.* The defendant made thousands of dollars from his role in the offense and he was *essential* to the smuggling operation since he piloted the plane and brought the aliens into the United States.

(Emphasis added.) The PSR concluded that "*[t]here are virtually no mitigating factors in this case.*" (Emphasis added.) The government recommended a sentence at the high end of the guideline range.

> Any lesser sentence would deprecate the *seriousness of Parmelee's ongoing, repeated criminal conduct....* Further, the current Guidelines *do not take into account the vast scope of the smuggling operation in which Parmelee was involved.* Also, throughout the months of the charged conspiracy, *Parmelee displayed great disdain and disrespect for the laws of the United States, for law enforcement, and for the general safety of the public and his passengers in the air and on the road.* Finally, Parmelee's criminal history indicates that throughout the years *he has had numerous run-ins with the criminal justice system,* and although he has *received second chances* and *breaks every time,* he has failed to benefit at all from these breaks. Parmelee is deserving of no similar break this time.

(Emphasis added.)

Judge Zagel adopted the recommendations contained in the PSR. With respect to the three level enhancement of Parmelee's base offense level for his role in the offense, the Judge stated:

> I'm inclined to believe that the probation officer got it right, and I do so find that she got it right; and the reason I do is largely because—the defense makes an argument that essentially all that occurred here was a—was Parmelee's use of his special skill and because he was the pilot he had to do a variety of things: rent the plane, undertake a variety of administrative duties.
>
> And I think to some extent this accounts for much of what he did and is *the reason why manager/supervisor is more appropriate* than leader/organizer. *It's inherent*

*in the nature of the job that a certain amount of organizing had to occur.*

> And that's essentially the heart of the government's argument: *that Parmelee really organized a lot of things, put them together, and therefore falls within the leader/organizer category.*
>
> But the truth is *there is inherent in the manager/supervisor category* in my view *a certain degree of management—a certain degree of organizing is inherent in that as well.*
>
> The reason I believe that the defendant's objection is—the reason I'm rejecting the defendant's objection is because it's quite clear to me that what was used here— *what Parmelee was using was more than his special skills [as pilot].* The incident with the beeper, the consultation on other related issues having to do with detection and a variety of other aspects of the offense go beyond the use of the special skill as a pilot, and I think he clearly qualifies as a manager/supervisor.

(Emphasis added.) The district court sentenced Parmelee to twenty-one months' imprisonment and three years of supervised release, and further ordered a fine of $12,000 and a special assessment of $850.

## II. ANALYSIS

The Sentencing Guidelines require a three point offense level enhancement if "the defendant was a manager or supervisor ... and the criminal activity involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). "The central concern of § 3B1.1 is relative responsibility." *United States v. Brown,* 944 F.2d 1377, 1381 (7th Cir.1991). Among the factors to be considered to determine whether a defendant acted as a manager or supervisor are: (1) the defendant's exercise of decision making authority; (2) the nature of the defendant's participation in the commission of the offense; (3) if the defendant claimed a right to a larger share of the fruits of the crime; (4) the degree of the defendant's participation in planning or organizing the offense; (5) the nature and scope of the illegal activity; and (6) the degree of control and authority exercised over others. *See* U.S.S.G. § 3B1.1, ap-

plication note 4; *see also United States v. Young,* 34 F.3d 500, 507 (7th Cir.1994). Nonetheless, the proper focus of an inquiry into a § 3B1.1(b) enhancement is " *'on the relative responsibility for an offense and not exclusively on one of the application note factors....'* " *Young,* 34 F.3d at 508 (quoting *United States v. Skinner,* 986 F.2d 1091, 1097 (7th Cir.1993) (emphasis added)).[6]

The district court's finding that a defendant played a managerial or supervisory role is *a finding of fact,*[7] that can be overturned only if *clearly erroneous.* 18 U.S.C. § 3742(d); *United States v. Vargas,* 16 F.3d 155, 160 (7th Cir.1994). " '[I]t is not the function of this [appellate] court to reweigh the evidence or to substitute its judgment for that of the trier of fact.' " *United States v. Hatchett,* 31 F.3d 1411, 1416 (7th Cir.1994) (quoting *United States v. Wisniewski,* 741 F.2d 138, 144 (7th Cir.1984). The district court's findings must stand *unless we are of the "definite and firm conviction that a mistake has been committed." United States v. Brown,* 900 F.2d 1098, 1102 (7th Cir.1990) (quoting *Anderson v. Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (emphasis added)).

The majority stakes its decision on the fact that Parmelee was not in a position to exercise authority or control over his co-conspirators. In *Vargas,* 16 F.3d at 160, we referred to authority and control over others—one of the application note factors—as "*a significant factor to be considered*" in determining the defendant's relative responsibility. *Id.* (emphasis added). Our focus on this one factor, however, was not meant to obscure that the central concern of § 3B1.1 is relative responsibility, and that this concern requires an examination of *all* the application note factors. *See Young,* 34 F.3d at 508; *see also Skinner,* 986 F.2d at 1097; *Brown,* 944 F.2d at 1381. The majority reads the statement in *Vargas* much too broadly.

In *Vargas,* we concluded that the district court had improperly enhanced Vargas's sentence based solely on the fact that he had supplied drugs and negotiated the terms of their sale. We expressly emphasized, however, that Vargas "might have earned a Section 3B1.1[ (b) ] increase had he been principally responsible for arranging the logistics of cocaine delivery or payments, because this would have required him to dictate to some extent, or at least coordinate" the actions of his confederates. *Vargas,* 16 F.3d at 160. We made clear that the mere fact that a defendant does not exercise control and authority over others, "in the sense of having the power to tell others what to do, does not necessarily disqualify the defendant for a Section 3B1.1[ (b) ] increase.... Rather, in some cases it may be enough that the defendant 'orchestrated' or simply 'coordinated' the activities of others." *Id.* (citations omitted).

The extent of a defendant's supervision of others does not necessarily determine his characterization as a manager/supervisor. For example, in *United States v. Carson,* 9 F.3d 576 (7th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 135, 130 L.Ed.2d 77 (1994), a case involving an extensive cocaine distribution network, we upheld the district court's finding that one defendant served a managerial/supervisory role in the operation, in spite of "slight" evidence of the defendant's exercise of control over others. *Id.* at 592. We observed that the defendant and his brother "were partners in distributing sizeable amounts of cocaine, and that [the defendant was the person] most responsible for providing security" to his co-defendants. *Id.* In *Carson,* we emphasized that " 'although a defendant did not supervise people, his extensive management responsibilities over property, assets, or activities of the criminal organization [can] justif[y] increasing his of-

---

**6.** Although application note 4 to § 3B1.1 of the Sentencing Guidelines lists these factors to aid the court in "distinguishing a leadership and organizational role from one of mere management or supervision," this court has employed these factors " 'to determine whether a defendant qualifies as a supervisor at all.' " *Young,* 34 F.3d at 507 (quoting *Brown,* 944 F.2d at 1380 n. 1).

**7.** This is true even though "the fact of manager status may be more difficult to ascertain than purely physical facts ... and may depend on an assessment of the broad context of the crime." *United States v. Mejia–Orosco,* 867 F.2d 216, 221 (5th Cir.), *cert. denied,* 492 U.S. 924, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989).

fense level pursuant to § 3B1.1(b).'" *Id.* (citation omitted).

The record in this case clearly demonstrates that Parmelee was the one individual principally responsible for arranging the logistics of smuggling the illegal aliens into the United States from Canada. Parmelee was responsible for securing and renting the plane and assuring that it was in proper working condition. Parmelee coordinated the date and time of each illegal flight with Sobiecki. As the pilot, Parmelee made key decisions, such as selecting the airfields from which to depart and arrive with a cargo of illegal aliens.[8] Parmelee had the authority to determine flight departure and arrival times, and select the flight route least likely to attract the attention of immigration officials. Parmelee frequently deviated from acceptable altitudes to avoid detection, and had the authority to abort a landing if he feared apprehension by the authorities. Such responsibilities necessarily required Parmelee *"to dictate to some extent, or at least coordinate"* the actions of Sobiecki, and indirectly, other confederates involved in the transportation of the illegal aliens. *Vargas,* 16 F.3d at 160.[9]

Parmelee took special precautions to ensure the security of his co-conspirators and alien cargo. With Sobiecki, he arranged for clandestine meetings for the delivery of the illegal aliens to Sobiecki at various locations in Chicago. Parmelee rented a beeper and gave it to Sobiecki, so that the two could remain in contact without leaving a trail of phone records. Parmelee flew the Piper Cherokee at dangerously low altitudes to avoid radar detection, and, once on the ground in Illinois, drove the aliens at excessive rates of speed to avoid surveillance. Parmelee was solely responsible for the safety and security of all of his passengers during their entire trip from Grimsby to the various delivery locations in Chicago.

Parmelee's role in the smuggling operation was so critical, it entitled him to nearly one-third of the fees collected from each Polish alien. Parmelee received from $700 to $1,000—a tidy sum—for each alien he smuggled into the United States. Bank records confirm that Parmelee made substantial sums of money in the course of the operation, during a time when he had virtually no legitimate income. Those records show that during the period from September 1990 through April 1991, Parmelee made regular cash deposits, usually in amounts ranging from $500–$3,000. Over the course of that eight month period Parmelee deposited a total of approximately $60,000 in cash into his bank account.[10] All of this evidence clearly shows

---

**8.** Parmelee argues that his decision-making authority regarding when and where to land the plane was limited to his responsibilities as pilot. This argument is without merit. Parmelee's first smuggling flight departed from an airport in Welland, Ontario, a port of entry. Parmelee later decided that Welland was not a safe point of departure because it was a port of entry, where immigration officials were more likely to be present. Parmelee substituted Grimsby Airpark, a small airport which is not a port of entry, and arrived and departed from Grimsby when the airstrip was closed. Parmelee further admitted that he suspected that *an investigation of his activities had been launched and he had discussed the possibility of using other airports to avoid surveillance.* Although his co-conspirators declined to implement these suggestions themselves, they told Parmelee that *he was free to use other airports at his own expense.* Thus it is quite clear that Parmelee, as the pilot, had the *authority to decide when and where to land the plane,* and that his authority far exceeded that of a mere rank and file criminal.

**9.** Five individuals were indicted for their participation in the alien smuggling operation. Even

though Parmelee may not have had dealings with all five of his co-conspirators, he must still be characterized as a manager/supervisor. "[T]he plain language of § 3B1.1(b) requires only that a defendant was a manager 'and the criminal activity involved five or more participants'—not that a defendant managed, or controlled, the five or more participants." *United States v. McGuire,* 957 F.2d 310, 316 (7th Cir.1992) (quoting U.S.S.G. § 3B1.1(b)); *see also United States v. Cantero,* 995 F.2d 1407, 1414 (7th Cir.1993); *United States v. Barnes,* 993 F.2d 680, 685 (9th Cir.1993), *cert. denied,* — U.S. —, 115 S.Ct. 96, 130 L.Ed.2d 46 (1994) ("[w]hile an enhancement under section 3B1.1(a) or (b) is proper only in a criminal activity involving more than five participants, there is no requirement ... that the defendant *exercise authority over* at least five participants before the enhancement can be applied") (emphasis in original).

**10.** Each illegal alien paid an average of $3,000 to be smuggled from Poland to the United States, of which Parmelee was paid $700 to $1,000 per alien. The short term cost of operating the plane was as little as $800 per trip. (Plea Synopsis at

that Parmelee's "participation in the operation was critical to its success; the operation simply could not have flourished without his [contributions]." *Young*, 34 F.3d at 508. Parmelee was more responsible than his co-defendants for the commission of the smuggling offense.

The majority's concern with whether the illegal aliens were participants in the offense for the purpose of U.S.S.G. § 3B1.1(b) needlessly obfuscates the fact that Parmelee was principally and solely responsible for arranging the logistics of each smuggling trip. Therefore, even if I were to accept the majority's position, which I do not,[11] the evidence would still be sufficient to justify the sentence enhancement imposed by the district court under section 3B1.1(b).

The majority in summary fashion rejects all of the evidence that Parmelee coordinated the details of the operation with Sobiecki, stating that it "*may* be merely inherent in Parmelee's role as pilot" and "*do[es] not necessarily* indicate that Parmelee managed or supervised others" (emphasis added). To the extent the majority believes this imputation is obligatory—that whenever the evidence of a defendant's role in the offense is susceptible to more than one interpretation, the district court must select the interpretation most favorable to the defendant—the decision conflicts with our jurisprudence on the clearly erroneous standard. It is well-established that "*[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.*" *Brown*, 900 F.2d at 1102; *United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir.1989) (emphasis added). The majority fails to elucidate or give any reason as to why

the sentencing judge's resolution of this issue was beyond the permissible range of options from which the court might have been expected to choose. I fail to understand how the majority can conclude that the trial judge's finding that Parmelee was acting in a supervisory role was clearly erroneous, especially in light of the significant and compelling evidence that Parmelee was principally responsible for arranging the logistics of each smuggling run.

This court has previously stated that "those who play an aggravating role in the offense are to receive sentences that reflect their greater contributions to the illegal scheme." *Brown*, 944 F.2d at 1381. "The reviewing court must give the district court's findings on this issue due deference because '[t]he district court is in the best position to assess the defendant's relative culpability vis-a-vis other participants in the offense.'" *Skinner*, 986 F.2d at 1097 (quoting *United States v. Tetzlaff*, 896 F.2d 1071, 1074–75 n. 4 (7th Cir.1990)). A determination as to the defendant's managerial or supervisory role in the offense is subject to reversal "*only if we have a definite and firm conviction that the district court made a clear mistake in sentencing.*" *Hatchett*, 31 F.3d at 1418 (emphasis added). The majority's failure to discuss whether the district court made a clear mistake in sentencing suggests that the majority is conducting a *de novo* review of the record—a path barred by the clearly erroneous standard.

## III. CONCLUSION

The record demonstrates that Parmelee was involved in a long-term, large-scale, sophisticated conspiracy, and that his involve-

---

2). Parmelee argues that after paying the short-term and long-term costs of operating the plane, he received "only" $3,000 to $5,000 monthly as his share of the proceeds from the criminal operation. Nevertheless, this is a very substantial sum of money. Moreover, it must be kept in mind that Parmelee's professed motive for joining the conspiracy was the chance to log flight time and thereby increase his pilot's rating. Consequently, the financial benefits Parmelee received from the criminal operation included not only his net earnings from each smuggling trip, but also the opportunity to log a large quantity of flying hours.

11. I have serious doubts as to the validity of the majority's position. In *Carson*, we held that a defendant's " 'extensive management responsibilities over property, assets, or activities of the criminal organization [can] justif[y] increasing his offense level pursuant to § 3B1.1(b),' " even if evidence that the defendant controlled others is slight. *Carson*, 9 F.3d at 592 (citation omitted). The majority's position would permit the sentencing judge to take into account a defendant's responsibility for managing things (*e.g.*, a cargo of marijuana), but deny the judge any opportunity to consider the defendant's responsibility for managing people (*e.g.*, a cargo of illegal aliens).

ment went far beyond the eight instances of alien smuggling and transportation set forth in the indictment. Parmelee showed a willingness to evade law enforcement officials, and used dangerous tactics to further his criminal objectives. Flying at dangerously low altitudes to avoid radar detection, driving at speeds in excess of 95 miles per hour, and weaving in and out of traffic, in an attempt to lose law enforcement surveillance of his activities, Parmelee endangered not only the lives of his passengers but also the lives of others who might have been in the immediate area. Parmelee knew full well that the authorities were chasing him during this time and he deliberately used extremely dangerous tactics in an attempt to evade them.

Parmelee's role in the offense was clearly more than that of a hired hand or rank and file criminal. Parmelee was not like a city cab driver who simply drives passengers to a requested destination in exchange for a fare. Nor was Parmelee like a commercial airline pilot, who boards an aircraft at a scheduled location and time, follows a pre-determined route, and whose responsibility for the safety and security of the passengers ends the moment they alight from the plane. Parmelee was an integral member of the smuggling conspiracy. He shared significant managerial responsibilities with his co-conspirator Sobiecki, and was paid generously for the risks he took. One performing only those duties inherent in the role of a pilot would never realize the profits Parmelee did. His participation in the illegal smuggling ring was critical to its success. The operation simply could not have flourished without his coordination and expertise. Based on the totality of the evidence presented, I fail to understand how the majority can conclude that the trial judge's finding that Parmelee was acting in a supervisory role was clearly erroneous. In light of Parmelee's relative responsibility within the overall smuggling operation, the district court did not clearly err in finding that Parmelee played a managerial/supervisory role in the offense.