**UNITED STATES of America,
Plaintiff,**

v.

**Miguel CRUZ, Defendant.**

**No. Crim. 98–087(DRD).**

United States District Court,
D. Puerto Rico.

July 14, 1999.

Bazan–Gonzalez, U.S. Atty's Office District of P.R., Criminal Division, Hato Rey, PR, for Plaintiff.

Joseph C. Laws, Federal Public Defender, San Juan, PR, Robert W. Odasz, Carolina, PR, Francisco Rebollo–Casalduc, San Juan, PR, for Defendant.

## OPINION AND ORDER

DOMINGUEZ, District Judge.

Defendant, Miguel Cruz, a salesman employee of Holsum Bakers, a bread manufacturing and distribution company doing business in Puerto Rico and the Virgin Islands, was charged together with John Blaine and Daniel Cruz, pilot and copilot of the cargo plane chartered[1] by Holsum Bakers, aiding and abetting each other, of transporting two aliens, Walid Qatoum and Jihad Sarrar, from St. Croix, United States Virgin Island to Luis Muñoz Marń International Airport in Carolina, Puerto Rico, on or around February 19, 1998, all in violation of Title 8, United States Code Section 1324(a)(1)(A)(ii) and United States Code, Title 18 Section 2.

The pilot John Blaine Gardner was also charged with providing false information in a United States Custom form by stating that no passengers were carried in a cargo air flight under his control from St. Croix, Virgin Islands, to San Juan, Puerto Rico, when in fact he knew that two persons, Walid Qatoum and Jihad Sarrar did in fact travel on the air cargo flight from St. Croix, Virgin Island to San Juan, Puerto Rico, on February 19, 1998, and in violation of Title 18, Section 2.[2]

The only defendant that went to trial, Miguel Cruz, timely requested acquittal at

the end of the government's case under Fed.Crim.Rule 29. The trial court reserved judgment. The defendant then timely reiterated the allegation after a verdict pursuant to Crim.Rule 29(c). The court is now ready to rule.

The defendant in its motion of acquittal, (Docket No. 81), and the United States in the opposition, (Docket No. 84), correctly state the proper Rule 29 standard guiding the court. The Rule 29 standard is "whether after assaying all the evidence in the light most favorable to the government, and taking all reasonable inferences in its favor, a rational fact finder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." *United States v. Hernandez*, 146 F.3d 30, 32, (1st Cir.1998), citing *United States v. O'Brien*, 14 F.3d 703, 706 (1st Cir.1994). The court may not evaluate credibility, all credibility issues must favor the verdict. *United States v. Garcia*, 983 F.2d 1160, 1163–64 (1st Cir.1993). Furthermore, "the criminal law does not place a special premium on direct evidence," *United States v. O'Brien*, 14 F.3d at 706, "to the contrary the prosecution may satisfy its burden of proof by direct evidence, circumstantial evidence or any combination of the two." *United States v. Hernandez*, 146 F.3d at 33. In fact, the evidence to convict "may be entirely circumstantial ..." *United States v. Batista–Polanco*, 927 F.2d 14, 17 (1st Cir. 1991).

The defendant, Miguel Cruz, however, suggests to the court of an important caveat, "if the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, [the] court must reverse the conviction." *United States v. Flores–Rivera*, 56 F.3d 319, 323 (1st Cir.1995).

---

1. The air cargo plane was chartered by Holsum Bakers to provide delivery of bread products to and from San Juan, P.R. and the U.S. Virgin Islands.

2. The two pilots plead and are not the subject of the instant Rule 29 Motion and/or Motion for Judgment of Acquittal.

The court, therefore proceeds to examine the evidence in the light "most favorable to the government, and taking all reasonable inferences in its favor." *United States v. Hernandez*, 146 F.3d at 32.

## I. THE FACTS

Alien Walid Qatoum, hereinafter "Walid," is a citizen of Jordan, is married and has three children. He attempted while in Jordan to acquire a visa from the U.S. Consulate but was unsuccessful. His passport was stamped with a mark from the U.S. Consulate which Walid erased. Walid has a brother validly residing in Milwaukee, Wisconsin. Walid received a fourteen-day visa to enter in St. Martin. The record is not clear if the visa was issued by the Dutch or by the French authorities. Walid traveled from Jordan to Amsterdam to St. Martin. He stayed in the Dutch side where he met another person of Arabic (Middle Eastern) descent called Jihad Sarrar, hereinafter referred to as "Jihad." Jihad was residing in the French side of St. Martin. Walid and Jihad looked unsuccessfully for a job in St. Martin.

Frustrated by their failure to acquire employment they both paid $1,500.00 to an operator of a small (15–18 ft.) boat to sneak them at night to St. Croix, U.S. Virgin Islands.[3] No luggage, no clothing but that which they were carrying, were carried by either alien in the night voyage. The passport of Walid fell in the water on the ship and got wet during the voyage. (Splashing of water constantly entered the vessel during the trip.) Walid and Jihad were both met in St. Croix upon arrival by people of their own arabic descent. Walid resided with another person of arabic descent. He looked for a job in St. Croix and could not find a job. He went to visit a person who was the owner of a grocery store who did not have a job to offer. That person is later identified by defendant Miguel Cruz as Mr. Hasson, the owner of Sunshine Grocery Shop in St. Croix, also of arabic descent. (Admitted by Cruz, Tr. at 6–8, 19, Docket No. 95.)[4] Sunshine Grocery Store is the largest and most significant client of Holsum Bakers in St. Croix. At the grocery store Walid meets co-defendant Miguel Cruz, "The Bread Man," hereinafter referred to as "Cruz," who is an employee of Holsum Bakers. That day Cruz was merchandising and stacking Holsum bread at the grocery store.

Walid requested Cruz to take him and Jihad to the states. Cruz originally declines. Walid originally testifies at the trial that he told Cruz that he possessed a passport and a valid visa.[5] Upon insistence by Walid, Cruz declines because Walid had a valid passport and a visa,[6] "You go alone." Cruz did not examine the visa. After hearing the testimony, the United States requested a recess[7] and confronted the witness "Walid" with a prior sworn statement. The witness was granted the opportunity to examine the prior sworn statement. Walid then stated that the prior sworn statement was a lie because he had been coerced and threatened (allegedly should he not sign the document he was to be sent by the authorities to jail as a Middle Eastern terrorist).[8] Walid accepted having an attorney and his brother present when he provided the original sworn statement.[9] Later in his testimony, Walid accepted that the signed statement was in fact provided on April 15, 1998, one and a half months after he arrived in Puerto Rico and while he lived in

---

3. Walid had paid $2,000 for the airplane ticket Jordan–St. Martin–Jordan.

4. • Also testified by Walid, Tr. at 82, Docket No. 65.

5. Tr. at 28, Docket No. 60.

6. The visa was for St. Martin not for entry into the United States.

7. Tr. at 30, Docket No. 60.

8. Tr. at 40, Docket No. 60.

9. Tr. at 41, Docket No. 60.

Milwaukee with his brother.[10] The prior written sworn statement is then read to Walid away from the presence of the jury.[11] Walid clarified upon void dire by defense counsel that one statement was originally drafted in Puerto Rico and then later sent to him in Milwaukee. Walid did not have his counsel with him when he signed the second version of the document in Milwaukee; however, he had counsel when the original draft was prepared in Puerto Rico.[12]

After a subsequent recess the witness is granted immunity by the United States for illegal entry in the United States, for obstruction of justice, altering a passport, providing false information and providing false statements under oath in court in the instant case. The witness, Walid, then agrees to continue testifying after consulting with an attorney which the court provided to Walid. The attorney was present and seated next to him from this point onward in the trial. Walid then states for the record through the interpreter that "now he wants to tell the truth and he wants to say exactly what happened[13]", Walid identifies "Cruz" as the person he met at the grocery store with the purpose to transport Walid to the airport and from there to Puerto Rico.[14] Walid testified that

he lied when he stated before in court that he showed the passport to Cruz and made him believe he had a visa to enter St. Croix.[15] Walid never showed Cruz any passport.[16]

Cruz confessed when he was arrested on April 14, 1998,[17] to Immigration Inspector Michael A. Blackwood facts relating to the airplane accommodation of Jihad and Walid on February 19, 1998. Cruz transported Jihad and Walid using Holsum Bakers route van from Sunshine Supermarket to the airport.[18] He picked both of them up around 5:30 A.M. The security gate was open, no security guard was present.[19] Cruz passed Walid and Jihad through the gate although they were not authorized to enter the port authority airport to the runway since they were not employees of Holsum Bakers. The two passengers did not have any identification badges whatsoever enabling then to enter the airstrip where the plane taxied to offload the bread.[20] Cruz recognized to the inspector that both Jihad and Walid were from middle eastern descent, "Arabic."[21] Cruz stated that both Walid and Jihad helped off load empty boxes from the van waiting for the plane to arrive.[22] Walid stated that the van arrived and parked next to the

---

10. Tr. at 43, Docket No. 60. Walid was allowed to travel to Milwaukee by posting a $10,000 bond.

11. Tr. at 57, Docket No. 60.

12. Tr. at 66–68, Docket No. 60.

13. Tr. at 73, Docket No. 60.

14. Tr. at 74, Docket No. 60.

15. Tr. at 74, Docket No. 60. The back and forth testimony of "Walid"—was he stating the truth originally when he testified or later when he was granted immunity—is for the jury to decide. *United States v. Hemmer,* 729 F.2d at 16, citing *United States v. Holladay,* 566 F.2d 1018, 1019 (5th Cir.), cert. denied 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978) "presentation of a witness who recants or contradicts his prior testimony is not to be confused with eliciting perjury. It was for the jury to decide whether or not to credit the

witness." Further the court in Hemmer cites *Hoffa v. United States,* 385 U.S. 293, 311, 87 S.Ct. 408, 418, 17 L.Ed.2d 374, for the proposition that "the credibility of … testimony [is] to be determined by a properly instructed jury."

16. Tr. at 74, Docket No. 60.

17. Tr. at 4, Docket No. 65. Prior to the confession Cruz was read his constitutional rights and signed a waiver. Ex. 11.

18. Cruz' statement, Tr. at 13, Docket No. 65.

19. Tr. at 56, Docket No. 65.

20. Cruz' statement, Tr. at 17, 29, Docket No.

21. Tr. at 16, Docket No. 65.

22. Tr. at 14, Docket No. 95.

chartered plane.[23] ("They arrived very close to the plane. Close to the airplane—" interpreter translating statement of Walid.)[24] Walid and Jihad spoke to Cruz on several occasions on February 18, 1998, prior to boarding the plane.[25] After the plane carrying the bread is off loaded, Jihad and Walid are ordered by Cruz to board the plane.[26] They enter the plane through a mobile ladder; they take the only seat available, two meters behind the pilot's seat. The pilots were not on the plane when they boarded the plane.[27] The pilots entered the plane and did not speak to them.[28] Prior to Walid and Jihad boarding the plane, defendant did not pass them through Customs which must be complied as recognized by Cruz for all passengers traveling from the Virgin Islands to Puerto Rico.[29] See also Regulations of United States Customs Service, Chapter I, Subpart N, Flights to and from the U.S. Virgin Islands, 19 C.F.R. § 122.14–144, stating that flights from the Virgin Islands to the United States are treated by the U.S. Customs as arriving from a foreign area.

19 C.F.R. § 122.14. Flights from the U.S. Virgin Islands to the U.S.

(1) . . .

(2) On Arrival. Aircraft departing from the U.S. Virgin Islands and arriving in the U.S. are governed by the provisions of this part that apply to aircraft arriving in the U.S. from a foreign area.

Once the plane arrived in Puerto Rico it proceeded to the air cargo terminal and small planes section (none airline passenger terminal) of the airport. John Blaine Gardner, the older of the two pilots then drove them to the airline passengers' terminal in his car (identified by Cruz through photographs, Ex. 7). The pilot took them through side entrances using his I.D. card to open doors. They did not enter the airport using the public entrances to the airline counters. The pilot did not take Walid and Jihad to Customs as required under Customs' regulations (Customs had to be made either in St.

23. Tr. at 80, Docket No. 60. The plane belongs to Dotita Air Cargo chartered to Holsum Bakers. The plane is configured for air cargo not designed in its interior to carry passengers. The plane has one jump seat for use by an FAA Inspector. Tr. at 45–53, Docket No. 58.

24. Tr. at 24–25, Docket No. 60.

25. Tr. at 62, Docket No. 60.

26. Tr. at 86, Docket No. 60.

27. Tr. at 87–91, Docket No. 60.

28. Tr. at 89, Docket No. 60. On several occasions Walid Qatoum was confronted by the United States with a prior statement containing contradictory evidence to the statements made in court. The District Attorney requested that the evidence be considered as substantive evidence in the case. The court declined. The jury was advised that statements not accepted by Walid Qatoum in court contained in the prior sworn statement were only valid to impeach and to refresh his memory but said prior sworn statement was not to be used as direct substantive evidence in order to prove the elements of the offense. In order for an out of court statement to be admissible as substantive evidence against the defendant pursuant to Fed.R.Ev. 801(d)(1)(A), the statement must have been made at trial or hearing subject to cross examination unless the statement was provided at another proceeding or deposition. Federal jurisprudence has clarified that sworn statements provided before officers are not "other proceedings;" statements before grand jury are "other proceedings." Fed.R.Ev. 801(d)(1)(A) (Tr. 9–14–16/98, Docket No. 60; *see* also exclusion of the sworn statement as direct evidence. Tr. at 13–21, Docket No. 80.) See generally *United States v. Micke*, 859 F.2d 473, 477 (7th Cir.1988); *United States v. Livingston*, 661 F.2d 239, 242–43 (D.C.Cir.1981); *United States v. Dietrich*, 854 F.2d 1056, 1060 (7th Cir.1988); *United States v. Day*, 789 F.2d 1217, 1221–22 (6th Cir.1986); *United States v. Tafollo-Cardenas*, 897 F.2d 976, 978 (9th Cir. 1990); *United States v. Perez*, 870 F.2d 1222, 1225–26 (7th Cir.1989); compare *United States v. Hemmer*, 729 F.2d 10, 16–17 (1st Cir.1984); *United States v. Bomski*, 125 F.3d 1115 (7th Cir.1997). *See* also 3 Stephen A. Saltzburg et all, Fed.Rules of Evidence Manual, Rule 801, p. 1475–76, 7th Ed.1998.

29. Admitted by Cruz, Tr. at 44–49, Docket No. 95.

Croix or in Puerto Rico). The pilot reported in writing to Customs Inspector Carlos Reyes that the aircraft did not carry passengers in the flight from St. Croix to San Juan (Ex. 14) (See statement of Inspector Carlos Reyes, Tr. at 66–75, Docket No. 58). The pilot then takes them to the Pan American Airways counter.[30] According to Walid the airline ticket attendant examines the tickets and the passports then directs Walid and Jihad to the immigration check point that is located immediately after the security check at the International Airport ramps. For a description of this immigration check point, see generally *Lopez Lopez v. M. Aran*, 844 F.2d 898, 906 (1st Cir.1988) (upholding the 4th Amendment constitutionality challenge of immigration regulations and check points at San Juan International Airport permitting passengers to be questioned by immigration inspectors concerning citizenship status prior to boarding flights to Continental United States.)

> "INS Agents at the Isla Verde International Airport conduct an initial inspection to determine the immigration status of prospective passengers by asking them about their citizenship. The question is usually posed, as we understand it, while the subject is walking to the departure gate. He or she needs not halt-nor necessarily slow downin order to respond when a traveler affirms that he or she is a citizen of the United States, and no further suspicion is aroused, the question stops and the individual remains free to proceed. On the other hand, if an agent comes to suspect that the traveler is an alien (or if the legality of the person's immigration status cannot readily be determined), then

the individual is referred to secondary inspection. In that phase of the inquiry, the INS officer takes the passenger to another section of the airport for further interrogation." *Lopez Lopez v. M. Aran*, 844 F.2d at 906.

Although Walid stated that he was directed by the ticket agent to the immigration officer at the departure gates, Walid and Jihad attempt to deceive the immigration officials at the pre-flight inspection by stating that they had "lost" the identification, notwithstanding that they both had presented passport identification to the airline counter Pan American employee.[31]

The immigration officials were not easily fooled. Predictably Walid and Jihad are referred to secondary inspection handled by Inspector Carmen Gómez. She stated that two Jordanians were referred to her from pre-flight inspection. They both had purchased the airplane tickets at the same place, National Mall in St. Croix on the same date, February 18, 1998.[32] The tickets were for travel from San Juan to New York on Pan American Airways Flight No. 0072. The two passengers were carrying Jordanian passports with no valid United States visa. They both provided false information stating that they had arrived the same date from St. Martin–St. Thomas—San Juan.[33] Both defendants had a noticeable accent (arabic).[34]

## II.  THE ELEMENTS [35]

The court is of the opinion that the United States must

> "prove beyond a reasonable doubt not only that the defendant knew the alien he transported had entered this county

---

**30.**  Tr. at 94–102, Docket No. 60.

**31.**  Tr. at 109, Docket No. 60.

**32.**  Tr. at 23–24, Docket No. 68.

**33.**  Tr. at 28, Docket No. 68.

**34.**  Tr. at 42, Docket No. 68.

**35.**  In pertinent part section 1324 provides that "[a]ny person who knowing or in reck-

less disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law." 8 U.S.C.A. § 1324(a)(1)(A)(ii) (1999).

in violation of immigration law, but also that the defendant knowingly transported the alien to further the violation, that is, acted willfully." *See, e.g., United States v. Chavez–Palacios et al.,* 30 F.3d 1290, 1294 (10th Cir.1994); *United States v. Diaz,* 936 F.2d 786, 788 (5th Cir.1991); *United States v. Medina–Garcia,* 918 F.2d 4, 7 (1st Cir.1990); *United States v. Hernandez,* 913 F.2d 568, 569 (8th Cir.1990) (per curiam); *United States v. Morales–Rosales,* 838 F.2d 1359, 1360 (5th Cir.1988); *United States v. Merkt,* 764 F.2d 266, 270 (5th Cir.1985) (per curiam); *United States v. Moreno,* 561 F.2d 1321, 1322 (9th Cir. 1977). Without a *mens rea* requirement, section 1324(a)(1)[ (A)(ii)] could penalize purely innocent conduct. *Staples v. United States,* [511] U.S. [600], 511 U.S. 600, 114 S.Ct. 1793, 1799, 128 L.Ed.2d 608 (1994); *Liparota v. United States,* 471 U.S. 419, 426, 105 S.Ct. 2084, 2088, 85 L.Ed.2d 434 (1985)

... "[w]e hold that a defendant's guilty knowledge that his transportation activity furthers an alien's illegal presence in the United States is an essential element of the crime stated in section 1324(a)(1)[ (A)(ii)]. In so holding, we decline to adopt a special test for determining guilty knowledge. (Citations omitted.) As in other criminal prosecution that require *mens rea,* the government may prove the defendant's knowledge by reference to the facts and the circumstances surrounding the case. (Citation omitted). Relevant considerations bearing on this issue include whether the defendant received compensation for his transportation activity, whether the defendant took precautionary efforts to conceal the illegal aliens and whether the illegal aliens were de-

fendant's friends or co-workers or merely human cargo. (Citations omitted.)." *United States v. Parmelee,* 42 F.3d 387, 390–91 (7th Cir.1994).[36] *See also* William G. Phelps, Annotation, *Validity, Construction and Application of 274(a)(1)(A)(ii) of the Immigration and Naturalization Act (8 U.S.C.A. 1324(A)(1)(A)(ii)), Making it Unlawful to Transport Alien who has Entered the United States in Violation of Law,* 133 A.L.R. 139 (1996).

The court must, therefore, examine whether Cruz beyond a reasonable doubt had knowledge that Walid and Jihad had entered the country illegally in violation of immigration law and whether the defendant knowingly transported the alien to further that violation.[37]

■ The court may examine the "circumstances surrounding the case" to determine *mens rea.* *United States v. Parmelee,* 42 F.3d at 391; *Liparota v. United States,* 471 U.S. 419, 426, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985).

■ The court concludes that there is no direct evidence that Walid and Jihad advised Cruz that they had entered in St. Croix illegally. As counsel for defendant correctly emphasizes, the fact that Walid recanted the exculpatory evidence that he informed Cruz of possessing a valid passport and visa does not mean that said recanting constitutes per se incriminatory evidence. The court takes the evidence merely as a recanting of the exculpatory evidence. However, there is on the record circumstantial evidence to satisfy both elements. The court explains.

The court examines the "relevant considerations" suggested in *Parmelee,* 42 F.3d at 391. Did Walid and Jihad constitute for Cruz merely "human cargo?" Cruz met Walid and Jihad at Sunshine

**36.** The court notes that *United States v. Parmelee,* actually references 8 U.S.C. § 1324(a)(1)(B) (1988), which reads precisely the same as the present charged offense 8 U.S.C.A. § 1324(a)(1)(A)(ii) (1999) due to the 1994 amendments to the statute.

**37.** The court delivered an instruction to the jury containing the elements stated herein, Instruction No. 16 (Elements of the Offense), Docket No. 67.

Grocery Store, owned by Hasson, also of arabic descent, the largest account of Holsum Bakers in St. Croix and Cruz's most important client which he serviced daily. According to Cruz, Hasson requested Cruz to provide Walid and Jihad "a ride to Puerto Rico."[38] Hence, aliens Walid and Jihad were important "human cargo" for defendant Miguel Cruz because he had an interest in the matter, to satisfy his clients request.

Although Cruz did not receive compensation for providing a "ride to Puerto Rico" to the aliens, the evidence examined in the light most favorable to the government clearly shows a clear pattern of "precautionary efforts to conceal the illegal aliens." *United States v. Parmelee, Id.* Cruz arranged to meet Walid and Jihad at 5:30 A.M. at the shopping center and passed them through the airport security post shortly thereafter when there were no guards present that could corroborate whether the persons he was carrying in the van as passengers had proper identification to enter the airport runway.[39] Walid and Jihad were permitted by Cruz while in the runway to unload empty boxes from the Holsum Bakers van thereby simulating that they were mere Holsum Bakers employees as the rest of the workers surrounding the plane.[40]

Counsel for defendant emphasizes a version of the facts more beneficial to defendant and that is that defendant entered the airport at 8:30 A.M. with the aliens in "plain view" of the airport security guards. However, the court in examining the record under Rule 29, must examine the record "in the light most favorable to the

government and [making] all reasonable inferences in its favor." *United States v. Hernandez,* 146 F.3d at 32. The version stated by the immigration inspector Blackwood is more consonant to the verdict since under said facts concealment of the aliens is present.

Cruz further did not pass the aliens through Customs as he recognized is required for all passengers traveling from the Virgin Islands to Puerto Rico. 19 CFR 122.14.

A further significant concealment of the aliens is made by the "aiders and abettors" of Cruz, the pilots who transported the aliens from St. Croix to San Juan.[41] The record reveals that upon landing in San Juan the aliens were moved from the air cargo section of the airport to the commercial airline terminal by the pilots through discreet side entrances used by personnel carrying identification cards and badges that opened said doors. The pilots did not take the aliens to customs and further informed customs that "no passengers" were transported in the flight from St. Croix to San Juan, P.R. (Ex. 14). Hence, although Cruz did not obtain any compensation, the record has ample clear evidence of concealment efforts by Cruz and those aiding and abetting him.[42]

The court must, therefore, conclude that the circumstantial evidence present in the case satisfies the elements that the "defendant knew the aliens he transported had entered the county in violation of immigration law" and "that defendant knowingly transported the aliens to further the viola-

---

**38.** Tr. at 10–11, Docket No. 95.

**39.** Admitted by Cruz to Immigration Inspector Michael Blackwood after Cruz received and acknowledged in writing having received proper constitutional warnings. Tr. at 4, Docket No. 65, DEA Form 13, Ex. 11.

**40.** Tr. at 14, Docket No. 95.

**41.** The pilots allowed the aliens, two strangers, in the plane without asking a single question to them pursuant to the testimony of Walid.

**42.** The sworn statement of Walid, not shown to the jury, stated that Cruz received a $2,000 compensation. Walid recanted this particular version of the facts (See court's Ex. 1 & 2). Walid also had hearsay knowledge struck by the court that Jihad had paid consideration to Cruz. Tr. at 93–94, Docket No. 60.

tion." *United States v. Parmelee,* 42 F.3d at 390.

Certainly the instant case clearly surpasses the potential horror story not intended to constitute a violation of the law of "a cab driver who transports in a routine commercial transaction an individual who announces his illegal alien status during the course of the ride." *United States v. Parmelee,* 42 F.3d at 391.

The instant accidented case initially interrupted by the passage of Hurricane George through the island of Puerto Rico on September of 1998, and delayed in sentencing procedures by a six month trial in 1999 attended by this court [43], therefore, comes an end. **The Rule 29 Motion of Defendant Miguel Cruz is, therefore, DENIED.**

IT IS SO ORDERED.

---

**43.** *United States v. Soto Beniquez,* Criminal    No. 97–76.