UNITED STATES of America,
Plaintiff–Appellee,

v.

Ramon VARGAS, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Raul CHAIDEZ, Defendant–Appellant.

Nos. 92–2872, 93–1559.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 9, 1993.

Decided Feb. 7, 1994.

Andrew B. Baker, Jr., Asst. U.S. Atty. (argued), Ronald J. Kurpiers, Asst. U.S. Atty., Office of The U.S. Atty., Dyer, IN, for U.S.

Joseph R. Lopez (argued), Chicago, IL, for Ramon Vargas.

Alexander M. Salerno (argued), Law Office of Alexander M. Salerno, Palos Heights, IL, for Raul Chaidez.

Before FLAUM and MANION, Circuit Judges, and REYNOLDS, District Judge.*

REYNOLDS, District Judge.

In these consolidated cases, Raul Chaidez ("Chaidez") appeals his conviction and sentence on charges of distributing and conspiring to distribute cocaine, and Raymond Vargas ("Vargas") appeals the sentence imposed as a result of his guilty plea to a charge of distributing cocaine. For reasons stated below, we affirm Chaidez' conviction but reverse the fine imposed as part of his sentence because of the district court's failure to make necessary findings. In addition, we reverse Vargas' sentence because we conclude that the district court incorrectly found him to be a "manager or supervisor" for purposes of an offense-level increase under Sentencing Guideline § 3B1.1(b).

## I. Proceedings Below

### A. Trial Testimony and the Verdict against Chaidez

Laurencio Lira ("Lira"), a government informant, testified to the following. On No-

---

* The Honorable John W. Reynolds, District Judge for the Eastern District of Wisconsin, sitting by designation.

vember 5, 1991, Gabriel Favela ("Favela") introduced Lira to Favela's cocaine suppliers, Chaidez and Vargas, at Chaidez' towing station in Chicago. After Chaidez left the room where the four had met, Favela and Vargas agreed to "front," meaning sell on credit, a kilogram of cocaine to Lira, and they discussed how and when to deliver it.

Two days later, Favela, having received the cocaine from Vargas, delivered it to Lira, who introduced Favela to the ultimate buyer, John Jones ("Jones"), an undercover detective. On November 21, with Lira present, Jones gave Favela $19,000 for the cocaine and asked to buy two more kilograms. On Favela's instructions, Lira called Chaidez' and Vargas' pagers. When the call was returned, Favela answered and indicated that the caller, Chaidez, had agreed to another sale. Favela and Lira then drove to Chaidez' towing station, where Vargas presented them with a single kilogram. When Favela informed Vargas that they had requested two kilograms, Vargas became angry, telling them they had not properly indicated that amount in their beeper call to Chaidez. Nevertheless, Vargas retrieved an additional kilogram. Chaidez, though present at the station, did not speak to Lira at the time.

On the way to delivering the cocaine to Jones, Favela told Lira that although Vargas "was doing all the actual transactions," Chaidez "was actually the one in charge" of the drug operation. (Tr. at 241–42.)

On December 17, 1991, Favela and Lira, the latter wearing a recording device, met with Vargas at Chaidez' towing station to discuss paying for the additional two kilograms of cocaine that had been delivered to Jones. When asked about the possibility of a $1,000 per kilogram price reduction, Vargas responded that he could authorize a $500 reduction but that Chaidez would have to authorize any greater reduction. At the same time, Favela asked Vargas about the possibility of buying another 6 or 8 kilograms, to which Vargas responded that he and Chaidez had access to 100 kilograms. Vargas also was asked whether he would be willing to drive the additional cocaine to Indiana; he refused, saying the delivery would be made at the towing station. When

Chaidez joined the meeting, he agreed to Favela's and Lira's plan for paying for the two kilograms, and also agreed to reduce the price per kilogram by $1,000, from $18,500 to $17,500.

On December 20, Lira and Favela collected $40,000 from Jones for the two kilograms, split $5,000 of it between themselves, and delivered the rest to Chaidez' towing station. Though Favela informed Lira that Vargas had provided him with a hollowed-out car battery in which to carry the money into the station, Lira insisted on carrying it in a golf bag, apparently because retrieving the battery from Favela's car would have delayed their arrival at the station. When they arrived, Vargas expressed anger over their failure to use the battery. Before Favela and Lira left, Chaidez proposed selling them 100 to 200 pounds of marijuana, and they said they would consider it.

On February 12, 1992, Favela and Lira again met with Chaidez and Vargas at Chaidez' towing station, where plans were arranged for a larger purchase of cocaine. Favela and Lira proposed that they bring the money for the purchase to the towing station, and that Vargas then drive to the cocaine storage facility to retrieve the appropriate amount of cocaine. Vargas objected to this plan, insisting that Favela and Lira meet him at the storage facility so that he would not have to transport the cocaine, but Chaidez endorsed the plan proposed by Favela and Lira. In addition, Chaidez agreed to lower the price per kilogram to $17,000.

On February 17, 1992, Lira and Favela collected $250,000 from Jones, enough for 12.5 kilograms at the retail price, and Jones asked to be fronted another 2.5 kilograms. Lira and Favela then met Vargas at Chaidez' towing station, and Vargas agreed to front the additional 2.5 kilograms. (Chaidez was in Mexico at the time). Vargas retrieved the 15 kilograms from a nearby storage locker and gave it to Lira and Favela, who delivered it to Jones at a motel, where Favela was arrested. Chaidez and Vargas were arrested shortly after that.

The jury found Chaidez guilty of conspiring to distribute cocaine, guilty of distribut-

ing cocaine on February 17, 1992, not guilty of distributing cocaine on November 7, 1991, and not guilty of distributing cocaine on November 21, 1991.

## B. Chaidez' Pretrial Motions

Prior to trial, Chaidez moved to preclude Lira from testifying as to Favela's statements concerning Chaidez' involvement in the conspiracy, and he also moved for a pretrial hearing on the statements' admissibility under the hearsay exception for statements of coconspirators. *See* Fed.R.Evid. 801(d)(2)(E). After the government filed a memorandum outlining its evidence of a conspiracy, the district court denied Chaidez' motions and ruled that the alleged coconspirators' statements would be "conditionally admitted," the condition being that the government introduce sufficient evidence of a conspiracy during trial. After the government presented its case, the court found that the requirements for admission of the coconspirators' statements had been satisfied, and the statements were admitted unconditionally.

Soon before trial, the government informed Chaidez that it planned to submit a new transcription of the recording of the December 17, 1991 meeting of Favela, Lira, Chaidez, and Vargas. Chaidez, who was given a continuance in order to review the new transcription, later moved to dismiss his indictment on the ground that inaccuracies in the original transcription had been relied upon by a witness before the grand jury. Specifically, Chaidez claimed, the witness testified that Chaidez was a party to certain conversations when, in fact, as the new transcription made clear, Chaidez had left the room before those conversations took place. The district court, finding that the original transcription had not been used before the grand jury, denied the motion to dismiss the indictment.

## C. Sentencing of Chaidez

The district court found Chaidez responsible for a total of 18 kilograms of cocaine, resulting in an offense level of 34, which was raised to 36 because of Chaidez' leadership role, pursuant to Sentencing Guideline § 3B1.1(c). This offense level, together with Chaidez' criminal history category, resulted in a guideline imprisonment range of 188 to 235 months, and a fine range of $20,000 to $40,000 for each count. The court sentenced Chaidez to 200 months and fined him $40,000. In doing so, the court indicated it was adopting the factual statements contained in the presentence report. The report included an analysis of Chaidez' financial condition, to which Chaidez had objected, but the court did not actually refer to that analysis and did not itself make findings regarding Chaidez' financial condition.

## D. Sentencing of Vargas

Vargas pled guilty to one count of distributing 15 kilograms of cocaine, a charge carrying a base offense level of 34. The court increased that level by three pursuant to Sentencing Guideline § 3B1.1(b), finding Vargas to have been a "manager or supervisor" of "extensive" criminal activity, and decreased it by two for Vargas' acceptance of responsibility, resulting in an adjusted offense level of 35. That, combined with Vargas' criminal history category, resulted in a guideline range of 168 to 210 months imprisonment. The court sentenced Vargas to 168 months imprisonment followed by three years of supervised release.

## II. Analysis

### A. Chaidez

#### 1. The Conviction

Chaidez challenges his conviction on three grounds, the first being that the district court erred in failing to conduct a pretrial hearing on the admissibility of Lira's testimony concerning Favela's statements. Because Favela was one of the alleged coconspirators, his statements, though hearsay, were admissible against Chaidez if the government could show by a preponderance of the evidence that the statements were made during the course of and in furtherance of a conspiracy. *United States v. Troop*, 890 F.2d 1393, 1403 (7th Cir.1989); *United States v. Santiago*, 582 F.2d 1128, 1131 (7th Cir.1978); Fed.R.Evid. 801(d)(2)(E). Although preliminary proof on this issue is desirable, such proof may be adduced in the form of a writ-

ten "proffer," rather than at a "full blown pretrial hearing." *United States v. Andrus,* 775 F.2d 825, 837 (7th Cir.1985); *Troop,* 890 F.2d at 1404 n. 18. The district court's selection of the former method was not an abuse of discretion.

■ Chaidez secondly contends that the district court should have dismissed the indictment against him on the ground that a grand jury witness may have relied upon an inaccurate transcript of the recording of the conspirators' December 17, 1991 meeting. Chaidez does not argue, however, that the government intentionally misled the grand jury, and there is no evidence that it did. Absent some such evidence, the conviction cannot be reversed on the basis of the inaccurate transcript (even assuming the witness relied upon it), for this kind of error in the determination of probable cause is rendered harmless by the subsequent conviction. *United States v. Daniels,* 848 F.2d 758, 759 (7th Cir.1988).

■ Chaidez' final argument with respect to his conviction is that the evidence against him was insufficient to support the verdict because it relied entirely on the testimony of Lira, who had himself been indicted for drug dealing (in another case) and was hoping to be given a reduced sentence in exchange for his testimony against Chaidez. Because a rational trier of fact could have believed Lira, however, his testimony was sufficient to support the verdict.

### 2. The Fine

■ In determining the amount of a fine, or whether to impose one, the district court is required to consider a variety of factors, among them the defendant's financial resources and the impact of a fine on the defendant's dependents. 18 U.S.C. § 3572(a); Sentencing Guideline § 5E1.2(d). In this circuit, furthermore, the district court must "make specific findings" with respect to those factors. *United States v. Jones,* 983 F.2d 1425, 1434 (7th Cir.1993); *United States v. Masters,* 924 F.2d 1362, 1369 (7th Cir.),

*cert. denied,* 500 U.S. 919, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991). The government contends that although the district court in this case did not itself make such findings, it satisfied its obligation to do so by expressly adopting the factual statements contained in the presentence report, which included an analysis of Chaidez' financial situation.[1]

■ This court has indeed held that a district court "may discharge its duty to make factual findings by adopting the findings contained in a presentence report." *United States v. Troka,* 987 F.2d 472, 475 (7th Cir.1993); *United States v. Kaufmann,* 985 F.2d 884, 900 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 2350, 124 L.Ed.2d 259 (1993). In both *Troka* and *Kaufmann,* however, the district courts had adopted the findings of the presentence report on a particular issue (namely, obstruction of justice) and by reference to a discrete portion of the report. In this case, by contrast, the district court never discussed the issue of concern here—the appropriateness of the fine—and never mentioned the presentence report's analysis of Chaidez' financial condition. Indeed, the court arguably did *not* adopt that analysis, for Chaidez had objected to it and the court expressly adopted only those "factual statements contained in the presentence report as to which there has been no objection." (Feb. 19, 1993 Sentencing Hearing Tr. at 5.) Finally, even if the court had specifically adopted the report's financial analysis, its duty to make findings would not have been exhausted, for the analysis addresses only one of the several factors relevant to imposition of a fine. Because the district court did not make the necessary findings, the fine must be vacated and the case remanded for resentencing on that matter.

### B. Vargas

■ Sentencing Guideline § 3B1.1(b) requires an offense-level increase of three "if the defendant was a manager or supervisor (but not an organizer or leader) and the

---

1. The government also contends that Chaidez is barred from challenging the fine on appeal because he failed to object to it at the sentencing hearing. We conclude, however, that Chaidez adequately preserved his challenge by filing a written objection to the relevant portion of the presentence report.

criminal activity involved five or more participants or was otherwise extensive." The district court in this case found that Vargas was a manager or supervisor because, first, he "was a source of supply," second, he made "managerial decisions" on whether cocaine would be fronted, third, "he had the authority to reduce the price," and, fourth, he "had access to the storage facilities." [2] (July 23, 1992 Sentencing Tr. at 21.) The court also found, based largely on the quantity of drugs involved, that Vargas' criminal activity was "otherwise extensive," and so it concluded that an offense-level increase under Section 3B1.1(b) was warranted.

Vargas does not challenge the district court's finding concerning the extensiveness of his criminal activity. Rather, he contends that his role in the drug operation was not that of a manager or supervisor. We review the district court's finding on this point only to ensure it was not clearly erroneous. 18 U.S.C. § 3742(e).

 An increase under Section 3B1.1 is appropriate for those defendants whose "relative responsibility" for the offense is found to have been greater than that of its other participants. *United States v. Skinner,* 986 F.2d 1091, 1097 (7th Cir.1993). In determining relative responsibility, a significant factor to be considered is whether the defendant exercised authority or control over others in the criminal operation. *United States v. Brown,* 944 F.2d 1377, 1381 (7th Cir.1991). The fact, however, that the defendant did not exercise such control, in the sense of having the power to tell others what to do, does not necessarily disqualify the defendant for a Section 3B1.1 increase. *Skinner,* 986 F.2d at 1099. Rather, in some cases it may be enough that the defendant "orchestrated" or simply "coordinated" the activities of others. *United States v. Rivero,* 993 F.2d 620, 624 (7th Cir.1993).

 Less than that, however, will not do. Supplying drugs and negotiating the terms of their sale do not by themselves justify a Section 3B1.1 increase, for these things do not indicate that the person who does them

has a greater degree of responsibility for putting together the drug operation or a particular deal than anyone else involved, including the customer. *See Brown,* 944 F.2d at 1381–82, 1385–86. Thus, Vargas' ability to supply cocaine (including his access to a storage facility), to sell it on credit, and to negotiate its price, did not put him in the role of manager or supervisor, any more than agreeing to buy the drugs put Favela and Lira in such a role.

Vargas might have earned a Section 3B1.1 increase had he been principally responsible for arranging the logistics of cocaine deliveries or payments, because this would have required him to dictate to some extent, or at least coordinate, the actions of Favela and Lira. But Vargas does not appear to have had any more responsibility in this regard than they did. Indeed, when Vargas objected to an aspect of Favela's and Lira's plan for the final cocaine delivery, his objection was overruled by Chaidez, who endorsed the plan. Vargas' actions do not indicate that he had any greater responsibility for the drug operation than anyone else involved.

We therefore conclude that Vargas was not a manager or supervisor for purposes of Section 3B1.1(b).

### III. Conclusion

For the foregoing reasons, the conviction of Chaidez is affirmed but the fine imposed upon him is vacated and his case remanded for resentencing with respect to the fine. In addition, Vargas' sentence is vacated and his case remanded for resentencing.

So Ordered.

---

**2.** In making these findings, the court apparently relied on the evidence presented at Chaidez' trial, which the prosecutor summarized during Vargas' sentencing hearing. Vargas did not object to that approach, and he does not challenge it here.