## In the
## United States Court of Appeals
### For the Seventh Circuit

No. 12-1206

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TYRONE REYNOLDS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:10cr164-002—**Rudy Lozano**, *Judge*.

ARGUED OCTOBER 3, 2012—DECIDED MAY 8, 2013

Before FLAUM, RIPPLE, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Tyrone Reynolds and seven confederates held a drug dealer captive for more than 12 hours while they robbed his home, transported him across state lines, and demanded that he give them money and drugs. Reynolds was later caught, convicted by a jury of kidnapping, 18 U.S.C. § 1201(a)(1), among other offenses, and sentenced to life imprisonment. On appeal Reynolds argues that the district court clearly

erred in its guidelines calculations by finding that he was a "leader or organizer" of the criminal activity, *see* U.S.S.G. § 3B1.1(a), and that he and the other assailants made a "ransom demand" during the crime, *see id.* § 2A4.1(b)(1). We uphold the leadership adjustment due to the overwhelming evidence in support of it. However, because we hold that the "ransom demand" provision of § 2A4.1(b)(1) requires, at a minimum, that the ransom demand be "made" to a third party, and because nothing in the record suggests such a demand was made, we vacate Reynolds's sentence and remand for resentencing.

## I. BACKGROUND

On an evening in October 2006, Reynolds and seven other men drove from Chicago to Gary, Indiana, to rob Glenford Russell at his home. All nine are natives of Belize. Russell, an admitted marijuana dealer, had previously lived in Chicago but moved to Gary after being robbed twice by other Belizeans. Reynolds had discovered the new location after previously following Russell home.

Reynolds's group ambushed Russell outside his house, demanding that he give them his "money and weed." Russell led Reynolds inside to a bathroom and turned over $15,000 he had hidden there on behalf of his employer, a drug lord. Reynolds believed there was more, though, and repeatedly demanded that Russell tell him where he had stashed drugs or "the rest of the money." When Russell denied having anything else,

Reynolds and a cohort beat him and cut him with a knife. Reynolds and two other men then tied up Russell with duct tape and electrical cord. Over the next three hours the assailants continued to interrogate Russell about the whereabouts of more money or drugs and eventually moved him to the basement, where Reynolds and another man beat him further. In the basement Reynolds was overheard telling Russell that he used to work for Russell's employer and was still owed money.

The events took a turn after Russell hatched a plan to get out of his house. Russell testified that the assailants seemed to think he was holding out on them and that he feared he would be killed if he did not satisfy their demands. To create an opportunity for escape, he proposed to Reynolds that he could take the group to a cache of 50 pounds of marijuana being stored at a car-repair garage in Chicago. The proposal was a ploy (Russell knew there was no marijuana at the garage), but Reynolds believed him and decided that the group would travel to Chicago the next morning in three separate vehicles, including a car owned by Russell. The assailants made the trip with Russell tied up in one vehicle, but shortly before they reached the garage Russell convinced the others to untie him and let him drive his own car so that employees at the garage would not become suspicious. As he drove toward the garage (all the while being held at gunpoint), Russell flung open his car door and dove onto the pavement. The car crashed into a parked vehicle, the assailants fled, and Russell escaped.

All eight assailants then regrouped at Reynolds's home, where Reynolds divided up the $15,000 taken from Russell's house. He gave $650 to Tynon Thompson, who criticized the cut as unfair. Jermaine Gentle received $700 and disparaged his share as "measly." Another assailant also complained about receiving only $700 and was told by Reynolds to "shut up" because "this was his move and his name that's going to get caught." The men then went their separate ways but were later arrested after Russell reported the crime to authorities.

Throughout the trial, Russell, Gentle, and Thompson repeatedly fingered Reynolds as the leader of the group. Russell asserted that Reynolds had been the "main one" interrogating him and appeared to be the leader because he had taken possession of the money, decided that the group would go to Chicago in the morning, and otherwise "called all the shots." Gentle testified that Reynolds had called him on the night of the attack (as well as the previous night, when the group made an aborted attempt to capture Russell) and was the group's leader because he handled and distributed the $15,000. Thompson said that he perceived Reynolds as the leader because he was the "loudest" and had the "bag of money."

Gentle and Thompson also testified that the group did not intend to release Russell until he coughed up more money or drugs. Gentle described Russell as their "hostage" and said that while no one intended to kill him, the group would not have allowed him to leave

until he provided the 50 pounds of marijuana he had promised. Gentle agreed with the prosecutor's statement at trial that Russell "had to come up with something in order to be freed."

Reynolds testified in his defense and denied knowing of or participating in the forced transport of Russell to Chicago to retrieve marijuana. He admitted going to Russell's home to rob him, striking him, and remaining in the home overnight with the other men, but insisted that he and Thompson departed before everyone else in the morning and had not known of the plan to take Russell to Chicago. Reynolds also denied having any leadership role in the crimes in which he admitted participating.

After the jury convicted Reynolds of kidnapping, 18 U.S.C. § 1201(a)(1), conspiracy to possess with intent to distribute marijuana, 21 U.S.C. §§ 846, 841(a)(1), and brandishing a firearm during a crime of violence or drug trafficking crime, 18 U.S.C. § 924(c)(1)(A)(ii), a probation officer calculated Reynolds's guidelines range as life imprisonment plus a consecutive term of seven years for the firearm conviction. Reynolds's offense level included a four-level increase because of his role as an organizer or leader, U.S.S.G. § 3B1.1(a), and a six-level increase because the probation officer believed that a ransom demand had been made during the crime, *id.* § 2A4.1(b)(1). Reynolds objected to those adjustments, arguing that Gentle and Thompson lied about his role and insisting that no one ever told Russell that he would be released if he provided money or drugs.

The district court denied Reynolds's objections and adopted the probation officer's presentence report. Regarding § 3B1.1(a), the court credited the trial testimony of Gentle, Thompson, and Russell. The court found that Reynolds located Russell's home in Gary and decided to rob it; "took charge" of the $15,000 and divided up the money; tied up, beat, and questioned Russell; and decided that the group would go to Chicago the next morning in multiple vehicles to retrieve the marijuana. Regarding § 2A4.1(b)(1), the court concluded that the assailants had made a ransom demand because they had insisted that Russell give them more money or drugs and did not intend to release him until he gave them something more. The court also noted, as the prosecutor had pointed out earlier in the hearing, that all of Reynolds's cohorts had agreed to the application of § 2A4.1(b)(1) when they pled guilty and their guideline ranges had included that adjustment. The court sentenced Reynolds to life imprisonment on his kidnapping conviction, 20 years on his drug conspiracy, to run concurrently with his life sentence, and 7 years on his firearm conviction, to run consecutively to his life sentence.

## II. ANALYSIS

### A. Ample Evidence Supported the District Court's Finding that Reynolds Was a Leader or Organizer

On appeal Reynolds first challenges the district court's finding that he was an "organizer or leader of a criminal activity that involved five or more participants."

U.S.S.G. § 3B1.1(a). He contends that he was not an "organizer or leader" because there is no evidence that (1) his relative responsibility for the crimes was any greater than the other seven participants, (2) he exercised control over any assailant, or (3) he coordinated the other participants toward a common objective.

When determining whether a defendant's role in a crime reaches the level of a leader or organizer, a district court must consider, among other factors, the nature of the defendant's participation in the offense, his claimed right to a larger share of the fruits of the crime, his degree of participation in planning or organizing the offense, and his degree of control and authority exercised over other participants. *See* U.S.S.G. § 3B1.1 cmt. n.4; *United States v. Knox*, 624 F.3d 865, 874 (7th Cir. 2010). The defendant must have organized or led at least one participant, U.S.S.G. § 3B1.1 cmt. n.2; *United States v. Vasquez*, 673 F.3d 680, 685 (7th Cir. 2012), but the "central concern" of the adjustment is the defendant's relative responsibility for the crime, *United States v. Mendoza*, 576 F.3d 711, 717 (7th Cir. 2009).

Here, the trial testimony amply supported a finding that Reynolds was the leader of the group. Gentle testified that Reynolds not only discovered the location of Russell's home but also determined the timing of the crime (as well as the timing of the unsuccessful attempt the previous night), the group's plan once Russell told them of his supposed marijuana stash in Chicago, and each participant's cut of the share. Russell in turn fingered Reynolds as the primary man who beat and

interrogated him, and Thompson testified that Reynolds believed that Russell and his employer owed him a personal debt. This testimony demonstrated Reynolds's significant level of planning, involvement in the crime, and degree of control over others. And though the testimony did not establish what portion each participant received from the $15,000 held by Reynolds throughout the crime, it strongly suggested that Reynolds kept a large share for himself because of his belief that the crime was "his move." Finally, the court's finding was largely based on its determination that the testimony of Russell, Gentle, and Thompson was credible, and we will almost never disturb a district court's credibility determinations. *See, e.g., United States v. Kamoga*, 177 F.3d 617, 622 (7th Cir. 1999). The evidence was simply overwhelming that Reynolds oversaw the scheme and had greater relative responsibility than the other participants.

## B. "Ransom Demand" Under § 2A4.1(b)(1) Requires that a Demand Be Made to a Third Party

Reynolds also disputes the district court's finding that during the crime "a ransom demand . . . was made." U.S.S.G. § 2A4.1(b)(1). Pointing to the definition of "ransom" in Black's Law Dictionary—"[m]oney or other consideration demanded or paid for the release of a captured person or property"—he contends that the finding was erroneous because no one testified that Russell was told he would be released if he provided more money or drugs.

This issue is difficult because "ransom" is not defined in the guidelines, and the commentary to U.S.S.G. § 2A4.1

gives no insight into what conduct the Sentencing Commission intends § 2A4.1(b)(1) to punish. Furthermore, the definition proposed by Reynolds (and endorsed by the government) is overinclusive: under the Black's Law definition, even a simple mugging would include a "ransom" demand if at some point during the attack the assailant offered to let the victim go in exchange for her valuables or some other benefit. Dictionaries should be used as sources of statutory meaning only with great caution, *United States v. Costello*, 666 F.3d 1040, 1043 (7th Cir. 2012), and here we think that the Black's entry does not comport with an ordinary understanding of what a "ransom" demand is.

We conclude instead that § 2A4.1(b)(1) may be applied only if kidnappers' demands for "money or other consideration" reach someone *other* than the captured person. In reaching this conclusion we look first to the language of the guideline, which presupposes the existence of a third party. The adjustment applies if "a ransom demand *or* a demand upon government was made." U.S.S.G. § 2A4.1(b)(1) (emphasis added). Those are distinct actions, and yet the Sentencing Commission has chosen to group them together and treat them as equally culpable offenses. Since a "demand upon government" cannot be made during a kidnapping without the communication of demands to people other than those held captive, we think that "ransom demand" is fairly read to also include this third-party element. Section 2A4.1(b)(1) is a

substantial[1] adjustment, and additional punishment is warranted when demands reach third parties because those who are contacted will experience great stress and may attempt a rescue, escalating the threat of violence. Moreover, kidnapping someone in order to compel *others* to act, as a substitute for confronting or attempting to rob those others in person, can be a very effective way to accomplish crime that merits heightened deterrence. But when a kidnapping is conducted without the knowledge of anyone except for the victim, the scope of the crime and risk of harm to others, while undoubtedly extensive, is nonetheless not as great. *Cf. United States v. Alvarez-Cuevas*, 415 F.3d 121, 126-27 (1st Cir. 2005) (construing § 2A4.1(b)(6) to apply only to situations involving third parties even though the section makes no explicit reference to them, because of additional harm implicated in such situations).

We also find it significant that U.S.S.G. § 2A4.1 appears to be the only Guidelines provision that applies the Hostage Taking Act ("HTA"), *see* 18 U.S.C. § 1203; U.S.S.G. § 2A4.1 Commentary (Statutory Provisions), which can only be violated if a person kidnaps another in order to influence a third party. *See United States v. Rodriguez*, 587 F.3d 573, 580 (2d Cir. 2009); *United States v. Ibarra-Zelaya*, 465 F.3d 596, 602 (5th Cir. 2006); *United States v. Fei Lin*, 139 F.3d 1303, 1306 (9th Cir. 1998). Enacted

---

[1] A defendant's offense level rises to 38 after application of § 2A4.1(b)(1) (including the base offense level of 32 in § 2A4.1(a)).

only three years before § 2A4.1(b)(1) was created along with the first Guidelines in 1987, *see* Pub. L. No. 98-473, § 2002(a), 98 Stat. 2186 (1984), the HTA punishes "whoever . . . seizes or detains and threatens to kill, to injure, or to continue to detain another person *in order to compel a third person or a governmental organization to do or abstain from doing any act* as an explicit or implicit condition for the release of the person detained." 18 U.S.C. § 1203(a) (emphasis added). Thus, one violates the HTA by either communicating demands to the government during a kidnapping or by demanding that a third party "do or abstain from doing any act as an explicit or implicit condition for the release of the person detained": in other words, making a ransom demand. Given these similarities in language and parallel structure, § 2A4.1(b)(1) appears to paraphrase the language of the HTA, and we therefore believe it is meant to apply only when a kidnapper issues demands in order to compel a third party (either the government or private citizen) to act. *Cf. James v. United States*, 550 U.S. 192, 206 (2007) (construing § 4B1.2(a)(2) in light of a provision of the Armed Career Criminal Act, whose language it tracks).[2]

Finally, we find it telling that although no appellate court has considered whether § 2A4.1(b)(1) requires the

---

[2] We further note that the Background of the U.S.S.G. § 2A4.1 Commentary refers to "kidnapping for ransom or political demand," which appears to also paraphrase the Hostage Taking Act with a similar parallel structure: "ransom" would seem to refer to a demand made upon a third party, while "political demand" would seem to refer to a demand made upon the government.

communication of demands to third parties,[3] we have not found a single appellate decision where the adjustment had been applied to a defendant who did not intend for his demands to reach a third party. Thus, practitioners seemingly have not regarded defendants convicted of kidnapping as making "ransom" demands when they do no more than force a victim to escort them to some stash of money or drugs before letting the victim go. We adopt the same interpretation today.

Because the demands issued by Reynolds's group did not reach a third party, we must reverse the district court's finding that a "ransom demand" had been made. The trial testimony was sufficient for the district court to find that Reynolds's group had demanded money or drugs from Russell in exchange for his release, but the demands were conveyed only to Russell and there is no evidence that anyone else learned of them before he escaped. In fact, the evidence shows that the group did not *want* Russell's capture to be discovered because

---

[3] The Ninth Circuit has actually stated that § 2A4.1(b)(1) "applies anytime a defendant demands money from a *third party* for a release of a victim, regardless of whether that money is already owed to the defendant." *United States v. Sierra-Velasquez*, 310 F.3d 1217, 1221 (9th Cir. 2002) (emphasis added). Though this language is likely dicta because the only issue before the court was whether a kidnapper demands "ransom" if he is owed the money he has demanded, *id.* at 1220-21, the court's apparent assumption that "ransom" means a demand to third parties supports our view of the word's conventional understanding.

the men allowed him to drive his own vehicle to the car-repair garage, untied, so that the employees there would not think anything was amiss. On this record, the application of § 2A4.1(b)(1) cannot be upheld.

### III. CONCLUSION

Accordingly, we VACATE Reynolds's sentence and REMAND for resentencing without application of § 2A4.1(b)(1).