In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3324

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JEFFREY WEAVER,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:11CR00153-001—**William T. Lawrence**, *Judge*.

ARGUED APRIL 30, 2013—DECIDED JUNE 3, 2013

Before FLAUM, WOOD and HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge.* Jeffrey Weaver sold methamphetamine on credit to two buyers, who paid off their debts by selling the drugs to their own customers. (In trade parlance, this is known as "fronting" the drugs.) Weaver pleaded guilty to conspiring with those buyers to possess and distribute methamphetamine, *see* 21 U.S.C. §§ 841(a)(1), 846, and the district court sentenced him to 235 months' imprisonment, the bottom of the guidelines

range calculated by the court. On appeal Weaver argues that the court overstated that range by assessing a 3-level upward adjustment for his perceived leadership role as a manager or supervisor of the conspiracy. *See* U.S.S.G. § 3B1.1(b). But there is no evidence that Weaver managed or supervised his buyers or any other participant, and thus we vacate the sentence and remand for resentencing.

While investigating a methamphetamine conspiracy operating in Indianapolis, the FBI learned that Weaver had been supplying Gregory Wilkey and Sysine Dale with two ounces of the drug, two or three times a week. Wilkey and Dale, with help from Wilkey's girlfriend and Dale's boyfriend, resold the methamphetamine from their homes. Weaver, Wilkey, Dale, the girlfriend and boyfriend, and two of Wilkey's and Dale's customers were charged in August 2011 with conspiracy. Weaver pleaded guilty without a plea agreement.

The probation officer's factual summary, which neither party disputed, sheds light on Weaver's role. That summary, in the presentence report, does not say how Weaver obtained the methamphetamine he fronted to Wilkey and Dale, who in turn sold the drugs and settled up with Weaver at the rate of $1,700 per ounce. According to the probation officer, Weaver "controlled how much and how often" Wilkey and Dale "would receive methamphetamine" and "instructed them to promptly sell it so he could distribute more to them." And at times, the summary continues, Weaver "would pressure" Wilkey and Dale to make sales. As an "example" of

this "pressure," the probation officer cited a single text message that Weaver had sent Wilkey. Weaver's message, which reads, "Whats up man just givin u a pep talk 'get r done' and hit me up," prompted Wilkey to send a text message to one of his own customers saying, "How quick can you get rid of ahalf no bull [expletive] oboys riding my [expletive] on this one." The probation officer's summary also characterizes Weaver as cautious about delivering methamphetamine and notes that he always arrived at a rendezvous without the methamphetamine and went back for it only after deciding that everything was "all right." Apparently these facts led the probation officer to recommend (without explanation) a 4-level upward adjustment under U.S.S.G. § 3B1.1(a), which applies to a defendant who was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."

Weaver objected to the proposed increase, and at sentencing a detective who investigated the conspiracy testified about Weaver's role. The detective explained that Weaver had offered to supply Wilkey with methamphetamine after learning that Wilkey was dissatisfied with his current source. The detective described Weaver's role as "setting the speed" of the distribution by often declining to supply Wilkey and Dale with methamphetamine at the precise times they wanted it, setting deliveries on short notice, and often showing up late for meetings. Moreover, Weaver refused to deliver drugs anywhere but at Wilkey's and Dale's homes or to deliver more than two ounces at a time. Yet on cross-examination the detective conceded that

Weaver did not control to whom or at what price Wilkey and Dale sold the drugs Weaver fronted.

The district court declined to apply a 4-level increase but did assess 3 levels under § 3B1.1(b), which applies to a defendant who was "a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." The judge explained his decision:

> Here I find that he clearly did exercise decision-making authority with respect to the activity of the conspiracy. He determined how much and how often Mr. Wilkey and Ms. Dale would receive methamphetamine, regardless of whether they needed it quicker than he was willing to provide. In fact, he often gave them just minutes notice of the dropoff at their residences.

> In addition, his participation in planning and organizing was extensive. He was always, as stated by the confidential informant, at the residence where the transactions took place early on. He was also careful in planning the delivery of meth. He would repeatedly arrive at a location without the methamphetamine to make sure everything seemed all right. Then he would leave and return with the meth.

> It appears that his participation was somewhat extensive. He had been distributing to [Wilkey] for two years and to Dale since May of 2011.

> It's also apparent he exercised a degree of control over the other participants in the criminal activity.

> He directed Wilkey to ensure the timely return of drug proceeds, and he pressured Wilkey and Dale to sell the methamphetamine promptly.
>
> Mr. Wilkey's text message is another example of the control he exerted. In a text to one of these customers, Mr. Wilkey wrote that you, Weaver, were putting pressure on him; and he expressed a desire to sell the meth quickly due to the pressure he was feeling from Mr. Weaver.
>
> I find and I agree with the argument, Mr. Baldwin [defense counsel] that it appears that he did not necessarily determine the price.
>
> He was not engaged actively in the recruitment of other distributors . . . .
>
> I do believe that the enhancement is appropriate in this case. I am reluctant, however, to find that Mr. Weaver was a leader or organizer. I feel that more appropriately, he was a manager or supervisor.

The court calculated a total offense level of 38, which, combined with Weaver's criminal history category of I, yielded an imprisonment range of 235 to 293 months. The court selected 235 months, well above the 10-year statutory minimum. *See* 21 U.S.C. § 841(b)(1)(A)(viii).

A defendant who is an organizer or leader of a criminal activity involving five or more participants gets a 4-level upward adjustment; a manager or supervisor receives a 3-level increase. U.S.S.G. § 3B1.1(a), (b). At the crux of this distinction and at the base of the rationale for this enhancement sits the relative culp-

ability of each participant in the criminal enterprise: those who are more culpable ought to receive the harsher organizer/leader enhancement, while those with lesser culpability and responsibility receive the lesser enhancement imposed on managers/supervisors. *See United States v. Reynolds*, No. 12-1206, 2013 WL 1891294, at *3 (7th Cir. May 8, 2013) (citing *United States v. Mendoza*, 576 F.3d 711, 717 (7th Cir. 2009)). And those with the least relative culpability receive no enhancement at all.[1] As *United States v. Graham* explained, "§ 3B1.1 . . . creates three relevant tiers for conspiracies that are 'extensive': a tier for leaders and organizers, a tier for managers and supervisors, and a tier for everyone else." 162 F.3d 1180, 1185 (D.C. Cir. 1998); *see also United States v. Albers*, 93 F.3d 1469, 1488 (10th Cir. 1996) ("[T]he gravamen of [Guideline 3B1.1] is control, organization, and responsibility for the actions of others[.]"). In short, relative culpability is a "central concern" of Guideline 3B1.1. *Mendoza*, 576 F.3d at 717. Weaver does not dispute that the conspiracy involved five or more participants. But he does argue that he was not a manager or supervisor.

The Guidelines do not define "organizer," "leader," "manager," or "supervisor." Application Note 4 does, however, list the factors courts should consider in distin-

---

[1] Likewise, because Guideline 3B1.1 is all about the culpability of one participant in the criminal enterprise *relative* to the culpability of other participants in the scheme, if all participants in the criminal enterprise are equally culpable, none receive the enhancement. *See United States v. Mustread*, 42 F.3d 1097, 1103 (7th Cir. 1994).

guishing between an organizer/leader on the one hand and a manager/supervisor on the other.[2] *See United States v. Figueroa*, 682 F.3d 694, 697 (7th Cir. 2012). Although Note 4 offered these factors to distinguish *between* organizers/leaders and managers/supervisors, we have, in the past, consulted these factors to decide whether Guideline 3B1.1 applies in the first place. Thus, we have used the factors to distinguish between low-level participants undeserving of any enhancement whatsoever and managers/supervisors worthy of the 3-level enhancement. *See United States v. Howell*, 527 F.3d 646, 649 (7th Cir. 2008); *United States v. Mustread*, 42 F.3d 1097, 1104 (7th Cir. 1994).

*United States v. Figueroa* found resort to these factors unnecessary: "If a judge, a probation officer, a lawyer, even a defendant, doesn't know what a 'manager' or 'supervisor' is, Application Note 4 isn't going to help him—especially since it's about organizers and leaders and *not* middle managers and low-level supervisors[.]" 682 F.3d at 697. Thus, more recently, we have said that "a manager or supervisor should be straightforwardly understood as simply someone who helps manage or supervise a criminal scheme." *United States v. Grigsby*,

---

[2] The seven factors are: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; and (7) the degree of control or authority exercised over others.

692 F.3d 778, 790 (7th Cir. 2012); *see United States v. Collins,* ___ F.3d ___, 2013 WL 1979129, at *6 (7th Cir. May 15, 2013); *United States v. Bennett,* 708 F.3d 879, 892 (7th Cir. 2013); *Figueroa,* 682 F.3d at 697 (finding no need "to worry, . . . whether a defendant given [the manager/supervisor] enhancement . . . 'exercised some control over others' or alternatively 'played a coordinating or organizing role.' "). That does not mean, however, that the factors in Application Note 4 are not instructive. To the extent those factors help to "straightforwardly" identify whether a defendant "helps manage or supervise a criminal scheme," courts may continue to consider them. Application Note 4 simply recognizes that organizers/leaders will exhibit more of those factors and to a greater degree than a lower-level manager/supervisor. And although it does not label the factors irrelevant to the manager/supervisor decision, neither does § 3B1.1 *require* the presence of any one of the factors as a prerequisite to imposing the manager/supervisor enhancement. *See Bennett,* 708 F.3d at 891; *Figueroa,* 682 F.3d at 697; *Mustread,* 42 F.3d at 1104 n.3 (finding "slavish adherence to [the Application Note 4 factors] unnecessary: the ultimate question is what relative role the defendant played").

So was Weaver a manager or supervisor? In advancing that he was, the government relies heavily on the suggestion that Weaver exercised decision-making authority and control over Wilkey and Dale by dictating when, how often, and how much methamphetamine Wilkey and Dale would receive. *See United States v. Slade,* 631 F.3d 185, 190 (4th Cir. 2011) (applying manager/supervisor enhancement when defendant "con-

trolled the activities of other participants"). In evaluating whether a defendant's control and authority over others merits the 3-level manager/supervisor enhancement, district courts should make a commonsense judgment about the defendant's relative culpability given his status in the criminal hierarchy. *See Graham*, 162 F.3d at 1185 ("When confronted with a heavily stratified conspiracy, a court must superimpose the [three-tiered] § 3B1.1 framework over the organizational chart of the conspiracy and, using the factors noted above, decide where to draw the two relevant lines that determine who qualifies for a § 3B1.1 enhancement.").

For purposes of § 3B1.1 then, a defendant exercises control and authority over another when he "tells people what to do and determines whether they've done it." *Figueroa*, 682 F.3d at 697; *accord United States v. Richards*, 198 F.3d 1029, 1034 (7th Cir. 2000) (finding "at least indirect control over [others] . . . as they did what [defendant] wanted, when [defendant] wanted it and where [defendant] wanted it done"); *United States v. Roberts*, 14 F.3d 502, 523 (10th Cir. 1993) (refusing to apply enhancement in the absence of "evidence of decision-making authority or control over a subordinate"). This exercise of control and authority will usually allow the defendant to impose some sanction, reward, or punishment for the underling's execution of the directed task. Thus, the ability to coerce underlings is a key indicator of control or authority suggestive of managerial or supervisory responsibility in the criminal enterprise. *See Bennett*, 708 F.3d at 892 ("Although most supervisors do not terrorize their subordinates (at least not physically),

administering sanctions for poor work quality is a quin-
tessential supervisory task."). Moreover, the importance
of coercion suggests that an underling's independence
from the defendant can undermine the government's
suggestion of control. *See Mustread*, 42 F.3d at 1105 ("But
Figueroa was one of Mustread's independent suppliers
and co-conspirators; he was never at [the defendant's]
beck and call."). Thus, while all participants in the
criminal activity need not be members of the same
street gang, crew, or formally organized criminal enter-
prise, some hierarchy among those involved in the
criminal activity must exist to qualify a defendant for an
enhancement under § 3B1.1. Finally, the enhancement
requires ongoing supervision, not a one-off request from
one equal to another during the course of the criminal
activity. *Figueroa*, 682 F.3d at 697-98 ("Because to be
a 'manager' or 'supervisor' is to occupy a role—to have a
status—cases distinguish between ongoing supervision
and merely asking a coconspirator on one occasion to
do something." (citations omitted)).

Weaver provided insufficient ongoing supervision and
coercive authority to warrant the enhancement. He
simply fronted methamphetamine to Wilkey and Dale,
urging them to sell it quickly and pay him. Yet
"[s]upplying drugs and negotiating the terms of their
sale do not by themselves justify a Section 3B1.1 increase,
for these things do not indicate that the person who
does them has a greater degree of responsibility for
putting together the drug operation or a particular
deal than anyone else involved, including the customer."
*United States v. Vargas,* 16 F.3d 155, 160 (7th Cir. 1994);

*see also United States v. Pagan,* 196 F.3d 884, 892 (7th Cir. 1999); *Mustread,* 42 F.3d at 1104; *United States v. Brown,* 944 F.2d 1377, 1381 (7th Cir. 1991); *United States v. Thompson,* 944 F.2d 1331, 1349 (7th Cir. 1991). Indeed, a borrower would not describe her loan officer as her "manager" or "supervisor" simply because the loan officer imposes a credit limit, dictates the interest rate and loan term, advertises for customers, and refuses to be available on weekends. In this sense, Weaver was no different than any other business that extends credit to customers: he encouraged behavior that would protect his investment and insure payment of the debt owed to him.

The district court deemed it significant that Weaver was cautious and budged little on matters such as price, delivery point, and quantity. Indeed, Weaver sometimes kept his customers waiting and even decided at times not to honor their requests for specific delivery times. But none of that makes him a manager or supervisor of his customers. He did not tell Wilkey or Dale what price *they* had to charge their customers, or impose territorial limits on their sales, or set distribution quotas. And presumably, if Wilkey and Dale did not resell the product or sold it at a loss, they would nevertheless remain indebted to Weaver at $1,700 per ounce. A manager or supervisor in a drug dealing enterprise (though he may surely mete out some punishment for the low-level dealers who performed inadequately) would have to eat that loss just as a retail store manager would assume the loss arising from the poor performance of a floor salesman. The best that can be said for applying the increase is that Weaver generally

pushed his wares aggressively and demanded prompt payment, though sometimes would get low marks for customer service. Weaver's interest in a quick turn-around, however, doesn't make Wilkey or Dale his underlings; as the probation officer appeared to understand, Weaver simply "instructed them to promptly sell" the methamphetamine "so he could distribute more to them." Trying to sell more while getting paid is what merchants—not necessarily managers and supervisors—do. *See Vargas,* 16 F.3d at 160; *Pagan,* 196 F.3d at 893; *Mustread,* 42 F.3d at 1104-05; *United States v. Sayles,* 296 F.3d 219, 225 (4th Cir. 2002); *United States v. Medina,* 167 F.3d 77, 81 n.4 (1st Cir. 1999); *United States v. Toro-Aguilera,* 138 F.3d 340, 343 (8th Cir. 1998).

For these same reasons, neither does the government's suggestion that Weaver recruited Wilkey into the conspiracy warrant application of the enhancement. The evidence suggests only that Weaver and his co-conspirators had nothing more than a merchant-customer relationship. All Weaver did through Wilkey's inclusion was solicit a new customer for his own wholesale drug dealing. Weaver did not stratify his drug organization by "hiring" Wilkey as an underling over whom Weaver exercised managerial or supervisory control.

In the end, the government did not offer any evidence that Weaver assumed quintessential managerial or supervisory tasks of the type we have concluded warrant an increase. *See Bennett,* 708 F.3d at 892 (administering sanctions for poor performance); *Grigsby,* 692 F.3d at 791 (supervising a bank robbery from outside the

bank); *Figueroa,* 682 F.3d at 697 ("tell[ing] people what to do and determin[ing] whether they've done it").

For these reasons, we VACATE the judgment and REMAND the case for resentencing.