NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 14, 2017
Decided December 15, 2017

*Before*

WILLIAM J. BAUER, *Circuit Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 16-3354

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. |
| *v.* | No. 12 CR 851-1 |
| ANTOINE MATTHEWS, *Defendant-Appellant*. | Matthew F. Kennelly, *Judge*. |

**O R D E R**

Antoine Matthews pleaded guilty to conspiring to possess and distribute heroin and to using a telephone to commit a felony. The district judge sentenced him to 156 months' imprisonment. He appeals the sentence, arguing that the judge erred by identifying him as a manager or supervisor of a criminal activity when calculating his guidelines range. *See* U.S.S.G. § 3B1.1. Because the judge did not clearly err, we affirm the sentence.

## I. Background

Matthews drew the attention of the FBI and local law enforcement while they were investigating Jesus Zambrano, a Mexican drug supplier. From October 2011 until his arrest in October 2012, Matthews obtained from Zambrano and his colleagues in Joliet, Illinois, more than 10 kilograms of heroin, which he in turn distributed wholesale to customers in Cleveland.

The first of four known drug transactions occurred on July 4, 2012, in Joliet after Matthews had set up the deal over the course of multiple phone calls with Zambrano. In one call Matthews told Zambrano that he wanted "five"—an apparent reference to five kilograms of heroin. In another call Zambrano told Matthews that he was "here" but that the "other guys" were still on their way. Matthews confirmed his presence by replying, "we too."

The next transaction took place three weeks later at a Joliet residence. In the preceding days, Matthews had been overheard on wiretapped phone calls complaining to Zambrano about the quality of his previous heroin purchase and telling him that the "next batch needs to be better" because "there's a lot of competition." In another call Matthews expressed displeasure with the heroin's quality and even threatened to end the relationship saying, "I'm done. I'm done. Already made me 800,000." But a transaction went through on July 27. That day near the residence government agents spotted two cars with Ohio license plates, one of which was registered to Matthews's associate and codefendant Lamar Egler. Agents watched an unidentified male arrive with a large duffel bag, and the Ohio cars departed an hour later.

The third transaction occurred on August 21, 2012, when Matthews sent Egler and Lewis Hall, two of his associates, to Joliet in his stead to purchase heroin. Matthews gave the men $330,000 to purchase approximately 6 kilograms of heroin. On the day of the transaction, the government intercepted calls in which Matthews instructed Egler when to count the money in front of the supplier and how to conduct the negotiation and purchase. For example, Matthews told Egler, "Don't do nothing till the big dude comes," referring to the supplier, and asked if Egler and Hall were counting money. Shortly thereafter, law enforcement intercepted a call in which Matthews first spoke with a supplier and then told Egler to be sure to check that the heroin amounted to 6 kilograms. Later, as Egler and Hall were returning to Cleveland to deliver the heroin (5.6 kilograms worth) to Matthews, they were arrested by Joliet police.

The final transaction occurred on October 6 at the same Joliet residence as the prior deal. Unable to turn to Egler and Hall, who were both in custody, Matthews brought to the meeting three other individuals, including a woman who was supposed to drive the 2.1 kilograms of heroin back to Cleveland. At the meeting Matthews was arrested by law enforcement, who then seized the heroin.

Matthews pleaded guilty to conspiracy to possess and distribute heroin, 21 U.S.C. §§ 841(a)(1), 846, and using a telephone to commit a felony, *id.* § 843. The government filed a notice that it would seek enhanced penalties under 21 U.S.C. § 851.

In the presentence report, the probation officer recommended that Matthews receive a four-level adjustment for being an organizer or leader under U.S.S.G. § 3B1.1[1] because he had directed Hall and Egler and because the conspiracy involved five or more participants. Matthews objected to the adjustment on the ground that he did not exert any real authority or control over Egler or Hall. He argued that there was no evidence he paid these men as subordinates; rather they were "independent drug dealers who would get their own portion of the heroin to sell." Matthews also disputed that the offense involved five participants; he insisted that the three uncharged individuals who accompanied him to the last drug transaction had not "actually participated in this scheme in any way other than by being present for the conversations." Last Matthews asserted that the criminal activity was not "otherwise extensive," *see* U.S.S.G. § 3B1.1, because (1) the sum of money he made was not uncommon for drug-conspiracy cases; (2) the transactions covered only four months and not an entire year; (3) only three people (Matthews, Egler, and Hall) were involved

---

[1] U.S.S.G. § 3B1.1 reads in part:

Based on the defendant's role in the offense, increase the offense level as follows:

(a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.

in the scheme other than the suppliers; and (4) the scheme involved transporting drugs from Illinois to Ohio and was not some "coast-to-coast operation."

The judge concluded that the evidence did not support a four-level adjustment for being an organizer or leader, but instead applied a three-level adjustment for being a manager or supervisor. The judge relied on the government's sentencing memorandum, which recounted the phone conversations between Matthews and Egler on August 21, 2012, when Matthews sent Egler and Hall to Joliet to pick up more than 5 kilograms of heroin. The judge also found that there were five or more participants: Egler, Hall, and the three attendees at the October 6 meeting (the two unnamed men and the woman who was supposed to drive the car). The judge found that the two unnamed men and the female driver were "going to a location where a drug deal is going to happen. . . . There is enough evidence that they . . . had enough knowledge of what was going on that they could be considered criminal participants." The judge also found the conspiracy to be "otherwise extensive" because there was a "significant monetary benefit" that occurred over a "reasonably significant period of time." With other adjustments, Matthews's advisory guidelines range was 262 to 327 months. The judge sentenced him to the statutory minimum 240 months in prison followed by 10 years' supervised release.

On appeal we granted the parties' joint motion to remand for resentencing based on the district court's imposition of certain conditions of supervised release in light of *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015). On remand the government moved to withdraw the § 851 notice based on the Sentencing Commission's intervening reductions to the offense levels tied to drug quantities. The judge granted the motion.

Matthews filed another sentencing memorandum that focused on the application of the factors under 18 U.S.C. § 3553(a). The memorandum did not address any guidelines issue, including the three-level adjustment under § 3B1.1, but at the ensuing sentencing hearing, counsel clarified that she wished to "revisit" the issue of Matthews's role in the offense. Counsel principally contested the finding that the scheme involved five or more participants or was "otherwise extensive."

The judge reaffirmed his earlier findings regarding the number of participants and the extensiveness of the criminal activity and sentenced Matthews to 156 months. The judge emphasized that "there was no question" that Matthews "was at the top of" the conspiracy because he "was directing other people around" and "in charge of this, part of the operation, if you will."

## II. Analysis

The Sentencing Guidelines provide for an increase in the guidelines range if a defendant was "an organizer or leader" or a "manager or supervisor" in "a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a), (b). The guidelines do not define "organizer," "leader," "manager," or "supervisor," but the application notes identify several factors that a court should consider when distinguishing between an organizer/leader on the one hand and a manager/supervisor on the other: (1) the exercise of decision-making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity; (7) and the degree of control and authority exercised over others. *Id.* § 3B1.1 cmt. n.4; *see United States v. Weaver*, 716 F.3d 439, 443 (7th Cir. 2013); *United States v. Grigsby*, 692 F.3d 778, 790 (7th Cir. 2012); *United States v. Figueroa*, 682 F.3d 694, 696 (7th Cir. 2012). But § 3B1.1 does not "*require* the presence of any one of the factors as a prerequisite to imposing the manager/supervisor enhancement." *Weaver*, 716 F.3d at 443.

Matthews challenges the application of the three-level adjustment for being a manager or supervisor, arguing that the evidence does not establish that he supervised Egler and Hall. He contends, for instance, that "a one-time favor undertaken by coconspirators, in the absence of other evidence[,] does not elevate a drug dealer into a supervisor." He denies exercising any decision-making authority and maintains that the intercepted calls with Egler show only that he was providing mere guidance rather than control.

These are the same arguments that Matthews made at sentencing. On clear-error review of a § 3B1.1 adjustment, "we will rarely reverse because the sentencing court is in the best position to evaluate the defendant's role in the criminal activity." *United States v. Leiskunas*, 656 F.3d 732, 739 (7th Cir. 2011). The judge did not clearly err in applying the adjustment. The government's evidence of wiretapped phone calls, in-person surveillance, and heroin seizures established that Matthews directed others to transport drugs between Illinois and Ohio and that he instructed the couriers on how to conduct the negotiations with the drug suppliers. It is true that the judge did not spell out his rationale in great detail, but he did specify at the original sentencing that he relied on the evidence set forth in the government's sentencing memorandum. In that memorandum the government recounted the phone conversations that preceded the

transaction on August 21, 2012. These included Matthews's phone calls telling Egler and Hall to "do nothing" until the supplier arrived, not to count the money, and not to set up until the supplier arrived because "you got to see what's up." Then a few minutes later, after speaking with his supplier, Matthews directed Egler and Hall to "pull all of them out"—i.e., to make sure that all of the heroin was delivered—and then told the two men to count the money. These calls reflect that Matthews was performing the duties of a supervisor who "tells people what to do and determines whether they've done it." *Figueroa*, 682 F.3d at 697. The judge reaffirmed his previous finding at resentencing when he stated that there was "no question" that Matthews "was at the top of it, he was directing other people around, he was kind of in charge of this."

Furthermore, the record as a whole—including facts from the government's version of the offense that Matthews did not dispute—bolsters the conclusion that Matthews exercised supervisory control over the enterprise. *See United States v. Ruelas-Valdovinos*, 747 F.3d 941, 944 (7th Cir. 2014). The government introduced evidence that on July 27 two cars with Ohio plates were parked outside the Joliet residence where the drug transactions took place; one was registered to Egler, suggesting that Egler was not merely a one-time participant in Matthews's scheme. Moreover, after Egler and Hall were detained, Matthews was able to replace them with other individuals who accompanied him to the October 6 deal, including one participant who was to transport the heroin back to Cleveland. And with regard to the July 27 transaction, Matthews was overheard speaking for others when he threatened to end one drug relationship due to poor quality heroin saying, "I'm done. I'm done. Already made me 800,000" and "I don't need it."

AFFIRMED.